Perkins *v.* Rogers.

The judgment is affirmed, with . costs.

*R. C. Gregory*, *R. P. DeHart*, and *M. M. Milford*, for appellant.

*B. W. Hanna*, Attorney General, for the State. ·

———————————•————————

PERKINS *v.* ROGERS.

CONSTITUTIONAL LAW.—*Power to Declare War.*—Congress alone has power to declare war; and the President of the United States has no power to declare war or conclude peace, except as empowered by Congress.

SAME.— *Existence of Peace or War.—How Ascertained.*— The existence

Perkins *v.* Rogers.

of war and the restoration of peace are to be determined by the political department of the government; and such determination is conclusive upon the judiciary.

SAME.—*Judicial Notice.*—The courts will take judicial notice of the existence of war or the restoration of peace, when proclaimed by the President.

WAR OF THE REBELLION.—*When it became a Civil War.*—The late insurrection of the Southern states did not become a civil war, and was not governed by the rules of war, until after the proclamation of President Lincoln, issued August 16th, 1861, pursuant to an Act of Congress of July 13th, 1861.

CIVIL WAR.—*Rules of.*—A civil war is governed by the same rules as a foreign war,

SAME.—*Effects upon Inhabitants of States in Revolt.*—The proclamation of August 16th, 1861, placed all the inhabitants of Louisiana in a state of insurrection, and they became the enemies of the United States, and all commercial intercourse between the citizens of that State and those of the loyal states during the continuance of the war was unlawful, except such as was specially permitted by the President.

CONTRACTS.—*Between Citizens of Belligerent Powers.*—All contracts made between the citizens of the rebellious states, on the one hand, and of the loyal states, on the other, during the war, and not licensed by the President, were void.

SAME.—*Made Prior to the War.*—Contracts made prior to the proclamation of August 16th, 1861, were valid; but during the war the debt and the remedy were suspended, and did not revive until the restoration of peace.

ENEMY.—*Right to Sue.*—During the existence of war an enemy cannot sue in any of the courts of the hostile belligerent power.

SAME.—*Status of Inhabitant of Louisiana during the War.*—An inhabitant of the State of Louisiana during the war of the rebellion'was an enemy of all the inhabitants of the State of Indiana, and could not maintain an action against any citizen of this State, in any of the courts of the United States.

SAME.—*Judicial Notice.*—The courts will take judicial notice that all the inhabitants of the State of Louisiana were in insurrection, but they will not take judicial notice that any of such inhabitants maintained a loyal adherence to the United States, or that any part of said state was occupied by the military forces of the United States, or that any person had a license or permit from the President.

RULES OF WAR.—*Occupation of New Orleans.*—The legal effect of the occupation of the city of New Orleans was to permit commercial intercourse between the citizens of that city and such citizens of the United States as were licensed by the President under the Act of Congress of July 13th, 1861.

STATUTE OF LIMITATIONS.—*Between Citizens of Different Belligerent Powers.*— The statute of limitations does not run, during the existence of war, between the citizens of different belligerent powers.

SAME.—*Restoration of Peace.*—Upon the restoration of peace, the statute of lim-

itations begins to run; for both the debt and remedy, which have been suspended during the war, revive.

SAME.—Although actual hostilities ceased in April, 1865, yet peace was not legally restored until the 20th of August, 1866, when the rebellion was declared completely suppressed, and peace restored, by the proclamation of President Johnson.

SAME.—*Period Excluded from Operation of Statute.*—In an action instituted by a citizen of Louisiana against a citizen of Indiana, the time that intervened between the 16th of August, 1861, and the 20th of August, 1866, is to be excluded, in determining whether the action is barred by the statute of limitations.

SAME.—*Pleading.*—*Demurrer.*—When a statute of limitations contains no exceptions, and it appears upon the face of the complaint that the action is barred, the bar can be taken advantage of by demurrer; but where there are exceptions, the statute must be pleaded by answer.

SAME.—*New Promise.*—A letter written during the existence of the war of the rebellion, by a citizen of Indiana to a citizen of Louisiana, cannot take a case out of the operation of the statute of limitations.

APPEAL from the Vermillion Circuit Court.

BUSKIRK, J.—John C. Rogers, as surviving partner of the firm of N. Overton & Co., brought this action in the court below, upon account, against the appellant. The complaint was in four paragraphs. The first was as follows:

"The plaintiff complains of the defendant, and says that he is the surviving partner of the late firm of N. Overton & Co., which firm was composed of the plaintiff, John C. Rogers, and Nathaniel Overton, who is now deceased. That the said firm have, for many years last past, been engaged in the business of commission merchants, in the city of New Orleans; that the defendant resides in Eugene, Vermillion county, Indiana, and has, for many years past, been engaged in the business of buying and shipping grain to the plaintiffs at New Orleans, to be by them sold on commisson on his account; that the said firm has made large advancements to the defendant by accepting and paying his drafts on account of shipments of corn made and to be made by the defendant to the said firm, amounting in the aggregate to six thousand, nine hundred and thirteen dollars, and twenty-seven cents, and which advancements exceeded the amount of all sales made

Perkins *v.* Rogers.

by said firm on account of defendant, in the sum of nineteen hundred and ten dollars and forty-six cents; that the plaintiff has duly rendered an account to the defendant, as such commission merchants, of all shipments of grain received, and of all sales made, on his account, and demanded the payment of the said balance, which he refused to pay; and the plaintiff demands judgment for three thousand dollars.

"Second. And the plaintiff further complains, and says that the defendant is indebted to him, as surviving partner of the firm of N. Overton & Co., in the sum of three thousand dollars, balance on account, for moneys paid and advanced by the said firm to defendant, the particulars of which are set forth in account filed herewith, leaving due and unpaid the sum of three thousand dollars, for which he demands judgment."

The third paragraph was for three thousand dollars money loaned.

The fourth was for money had and received. There was filed with the complaint an itemized statement of the dealings between the parties. The first item charged was 1st August, 1860, and the last was April 15th, 1861. The first item in the credits was September 22d, 1860, and the last item, except one for interest, was April 27th, 1861. The balance due was nineteen hundred and ten dollars, and forty-six cents. The action was commenced May 6th, 1868.

The appellant demurred to the first, second and fourth paragraphs of complaint. The demurrer was overruled, and an exception taken.

The appellant filed an answer in three paragraphs. The first was the general denial. The second and third were in these words:

"For second answer, the defendant says that the cause of action mentioned in plaintiff's complaint did not accrue within six years next before the commencement of this action."

"For answer third, the defendant says that the transactions alleged in plaintiff's complaint were made during the late rebellion, during which the parties hereto occupied a hostile relation as enemies, they being citizens and residents of different sections of the United States of America, to wit, the said firm of N. Overton & Co., at the time, resided in the city of New Orleans, and in the State of Louisiana, and the defendant, at the time, resided in the State of Indiana; that the inhabitants of the said sections of the United States were, at the time of the said transactions, at war with each other, and subject to all the rights and disabilities of alien enemies."

To this answer the plaintiff replied in five paragraphs, which read as follows:

"First. Comes the plaintiff; and replies to the second paragraph of defendant's answer, and says that the cause of action mentioned and set forth in plaintiff's complaint did accrue within six years next before the commencement of this suit. Second. And for further reply to the second paragraph of the defendant's answer, plaintiff says that the defendant, within six years next before the commencement of this suit, by writing signed by him (a copy of which is filed herewith and made a part of this reply), promised to pay the plaintiff the several demands mentioned and set forth in his said complaint. Third. And for further reply to said second paragraph of said defendant's answer, he says that at the time his said cause of action accrued, to wit, on the 17th day of April, 1861, the plaintiffs were actual residents of the State of Louisiana, and that the defendant was an actual resident of the State of Indiana, and that both of said parties have continued to reside in their respective states as aforesaid, until the present time, and that at the time the plaintiff's cause of action accrued as aforesaid, war existed, by reason of the late rebellion, between the United States and the State of Louisiana, which was continued until the 13th day of June, 1865. And so the plaintiff says that six years had not elapsed between the close of the war and the commencement of this suit. Fourth. And the plaintiff further replies to the second paragraph, and says that from

the date of the transaction between the plaintiff and the de-
fendant. mentioned and set forth in the complaint, to wit, on
the —— day of ——, 1860, until the commencement of
this suit, the plaintiffs were actual residents of the State of
Louisiana, and the defendant was an actual resident of the
State of Indiana; that from the 17th day of April, 1861,.
until the 13th day of June, 1865, civil war, by reason of the
late rebellion, existed between the subjects and citizens of
the State of Indiana, and the State of Louisiana; and so the
the plaintiff says that the interval of time which elapsed from
the time that the plaintiff's cause of action accrued, to the
beginning of the war, and from the close of the war to the
commencement of this suit, did not, together, amount to six
years.     Wherefore, he says that this cause of action did'
accrue with six years next from the beginning of this suit.
Fifth, And the said plaintiff replies to the third para-
graph of defendant's answer, and says that he denies each
and every allegation in said paragraph." The exhibit referred:
to in the above reply reads as follows.

"July 20th, 1863, EUGENE, Indiana.
"MESSRS. N. OVERTON, & Co., New Orleans:

"*Dear Sir,*—I have often thought of you and the many
pleasant times I have had in your city.   I was pained to learn
of the death of Mr. Overton.   Now to the point in ques--
tion.   When this war broke out, I had a large lot of corn
bought for you.   Indeed, I kept shipping so long that accord-
ing to account current I,—there is two shipments that I have
no account of; as I was going to say, the corn I had after I
could not ship I had to sacrifice at a ruinous price.   At
that time our whole country was aroused and thought of
nothing but the war.   I had been selling goods for many
years, as well as practicing medicine—had thousands of dol-
lars standing out due me.   Half of those persons are in the
army.   Consequently, I had to fail, though I have paid the
last debt but yours.   Mr. Rogers, just keep quiet, the time
is not far off, I hope, that our once prosperous country will·

VOL. XXXV.—9

be united, and I hope on satisfactory terms. I have been sick for eight months, not able to do anything. My health is getting good again. I am able to attend to the duties of my profession at this time. You need have no fears about losing what I owe you, if I keep my health. I protested the draft you gave Mr. Peyton for two reasons : I had failed; and the other, I wanted to see to those shipments. You spoke in a letter I got of you, that you always took me to be a man of integrity. If I could see you and talk with you, I would satisfy you that it was circumstances which I had no control over, and not the lack of integrity, that such has been the case. I do not know when I will be able to meet it, but shall work hard. Give my very best respects to Mrs. Overton and family. Write soon.

I am, respectfully, your most obedient servant,

R. A. PERKINS."

The appellant demurred to the second, third and fourth paragraphs of the reply, which demurrer was overruled, and to which ruling the appellant excepted.

The cause was, by the agreement of the parties, submitted to the court for trial. There was a finding for the plaintiff in the sum of two thousand two hundred and nineteen dollars and fifty four cents. The appellant moved the court for a new trial, and assigned in support thereof five causes, as follows :

1st. That the finding and judgment of the court are not sustained by sufficient evidence. 2d. Error of the court in overruling the demurrer to the first, second, third and fourth paragraphs of the complaint, and the demurrers to the second, third, and fourth paragraphs of the replication. 3d. Error of the court in admitting as evidence the letter of the defendant, Robert A. Perkins, dated July 20th, 1863, to N. Overton & Co. 4th. Error of the court in not holding as void, and rejecting from the account of the plaintiff, all the transaction and items therein named on and after the 15th day of April, 1861. 5th. Error in assessing the amount of the money ; that the sum is too high.

The court overruled the motion for a new trial, and the appellant excepted to such ruling. The evidence is in the record by a bill of exceptions.

The appellant has assigned a large number of errors, but they mainly relate to the action of the court in overruling the demurrers to the complaint and the reply, and to the admission in evidence of the letter of the appellant to the appellee. We shall not examine the errors assigned in detail or in the order of events. The errors complained of resolve themselves into two or three general propositions, the determination of which will be decisive of the questions involved in this case.

The appellant, in the third paragraph of his answer, alleges that when the account upon which this action is brought was created, the parties to this action were alien enemies, by reason of the existence of war between the United States and the state of Louisiana. He maintains in argument that all commercial intercourse between the citizens of the two belligerent powers was prohibited by international law, and was consequently illegal, and constitutes no valid consideration. The appellee maintains that all the dealings between the parties had taken place before the late rebellion had become a civil war, and that consequently commercial intercourse was lawful. The determination of these questions necessarily involves an inquiry into the nature and character of the late rebellion. The real questions are, was it a mere insurrection in the beginning? and if it was, when did it cease to be such? and when did it become a civil war?

The appellant also maintains that the cause of action sued on did not accrue within six years, and that as that fact appears affirmatively upon the face of the complaint, the question was properly raised on the demurrer to the complaint.

The appellee insists that the question was not properly raised on the demurrer to the complaint, because the court will judicially take notice of the fact that a state of war existed between the United States and the State of Louisana,

of which the plaintiff was an inhabitant and citizen, and that the court will not and cannot judicially take notice of the fact that the plaintiff resided at a place in the said State which maintained a loyal adhesion to the union and constitution, or was occupied and controlled by the forces of the United States; in other words, that the proclamation of the President of the United States having declared that the whole state of Louisiana was in a State of insurrection, the court will take judicial notice thereof; but that if the appellant relied on the fact that the plaintiff resided at a point in a state that was loyal to the union, and was occupied and controlled by the forces of the United States, it was his duty to allege and prove the facts necessary to bring the case within the bar of the statute. The appellant in the second paragraph of his answer pleaded that the cause of action mentioned in the complaint did not accrue within six years next before the commencement of this action.

The appellee, in the fourth paragraph of his reply, attempts to avoid the answer setting up the staute of limitations by alleging that the appellee was an inhabitant and citizen of the State of Louisiana, and that the appellant was an inhabitant and citizen of the State of Indiana; that war existed between the United States and the State of Louisiana; that the appellee and appellant were alien enemies; that by reason of the existence of civil war all commercial intercouse and the right to institute and prosecute actions in courts between alien enemies were prohibited and unlawful; that the war did not destroy, but suspended, the debt sued on, and that it was not revived until the full and complete restoration of peace; that although the statute of limitations had commenced running before the war, yet as soon as a state of war existed it suspended the operation of the statute; and that it remained suspended until the 13th day of June, 1865, when the President by proclamation declared that peace existed, and, excluing the time when the statute was so suspended, the action was brought within six years.

The appellee also attempts to avoid the statute of limita-

Perkins *v.* Rogers.

tions by alleging that the appellant, on the 20th day of July 1863, acknowleded in writing the existence and validity of the debt sued on.

The appellant attempts to answer the acknowledgment of the debt, by showing that when the letter was written containing such acknowledgment all commercial intercourse between the parties to this action was prohibited and unlawful, and that the acknowledgment, if made, was illegal and void. The appellant also insists that the acknowledgment relied upon was not valid, because "it is vague, equivocal, indeterminate, doubtful and conditional, leading to no certain and definite conclusions" and that "an acknowledgment that will take the case out of the statute must be without qualification and without conditions."

The appellant also attempts to answer the position of the appellee that the statute was suspended during the war, by assuming that when the forces of the United States occupied and controlled the city of New Orleans, where the plaintiff resided, the statute again commenced running.

The appellee maintains that the occupation of the city of New Orleans did not have the effect contended for, because the state of civil war existing between the State of Louisiana and the United States made all the citizens of such State alien enemies, and an alien enemy can not maintain an action in the courts of a state that was loyal to the government, and the authority of the United States did not extend beyond the actual territory occupied by the forces of the United States; that such occupation did not relieve the plaintiff of the disabilities upon him and other citizens of the state, and restore to him the right to institute and maintain an action in the courts of this State; that such occupation did not render commercial intercouse lawful, except in so far as the right to trade was given by special permit from the Secretary of Treasury; that under the proclamation of General Butler, the person and property of the plaintiff were entitled to protection, but this protection did not extend beyond the actual limits occupied by the forces of the United

States; that the statute of limitations, having been suspended by the war, it did not not commence to run until the entire state was restored to peaceful relations with the federal government.

Having thus stated the respective positions assumed by the parties, we proceed to their consideration, duly impressed with their magnitude and importance, and the responsibility imposed upon us. Inasmuch as the decision of these grave questions will involve a construction of the constitution of the United States, our inquiry into the separate and joint power of the President and Congress to make and declare war, and the legal consequences resulting from a state of war, we shall mainly rely upon the decisions of the Supreme Court and circuit courts of the United States.

It is claimed by the appellant that the account upon which this action is based was created during the existence of war between the State of Lousiana and the United States, and that by reason thereof commercial intercouse was prohibited and unlawful. The determination of this question will depend upon what constitutes war in a legal sense, in the sense of the law of nations, and of the constitution of the United States. The last item charged in the account against the appellant was for money paid on the 15th day of April, 1861, and the last item entered to his credit was on 29th day of April, 1861. Had the late rebellion, at either of these dates, become a civil war, with the legal consequences of war, as fixed by the law of nations?

The first case that came before the Supreme Court of the United States, that involved an injury into the late war was what is known as the Prize Cases, which decision was rendered at the December term, 1862, and is reported in 2 Black, 635. The court at the time was composed of nine judges. The decision was rendered by a divided court. GRIER J., delivered the opinion of the court. This opinion was concurred in by WAYNE, SWAYNE, MILLER and DAVIS JJ. The dissenting opinion was delivered by NELSON J., and was concurred in by TANEY, CATRON, and CLIFFORD, JJ. The first

vessel was captured on the 17th of May, 1861, the second on the 20th of May, 1861, and the third on the 10th of July, 1861. The majority of the court held that the President of the United States possessed the power under the consitution to declare war, and that the proclamation of blockade by the President on the 27th and 30th of April, 1861, was itself conclusive evidence that a state of war existed.

The minority of the court were of the opinion, that by the constitution, Congress alone had the power to declare war, and that, consequently, the late rebellion did not become a civil war until it was made such by proclmation of the President, on the 16th day of August, 1861, and which was under and by virtue of the power that was confered on him by the act of Congress, July 13th, 1861. The decision pronounced by the majority of the court has been overruled by several decisions rendered, and the opinion expressed by the minority of the court has since been approved and recognized as the law. We therefore feel entirely justified in quoting from the opinion delivered by NELSON. J.

NELSON, J., says, " In the case of a rebellion or resistance of a portion of the people of the country against the established government, there is no doubt, that if in its progress and enlargement the government thus sought to be overthrown sees fit, it may by the competent power recognize or declare the existence of a state of civil war, which will draw after it all the consequences and rights of a war between the contending parties, as in the case of a public war. Mr. Wheaton observes, speaking of civil war, 'But the general usage of nations regards such a war as entitling both the contending parties to all the rights of war, as against each other, and even as respects neutral nations.' It is not to be denied, therefore, that if a civil war existed between that portion of the people in organized insurrection to overthrow this government at the time this vessel and cargo were seized, and if she was guilty of a violation of the blockade, she would be lawful prize of war. But before this insurrection against the established government can be dealt with on the footing

of a civil war within the meaning of the law of nations and the constitution of the United States, which will draw after it belligerent rights, it must be recognized or declared by the war making power of the government. No power short of this can change the legal status of the government, or the relations of its citizens, from that of peace to a state of war or bring into existence all those duties and obligations of neutral third parties, growing out of a state of war.' Again he says:

"For we find that to constitute a civil war in the sense in which we are speaking, before it can exist, in contemplation of law, it must be recognized or declared by the sovereign power of the state, and which sovereign power by our constitution is lodged in the Congress of the United States; civil war, therefore, under our system of government can exist only by an act of Congress, which requires the assent of two of the great departments of government, the executive and legislative." Again he says:

"In the breaking out of a rebellion against the established government, the usage in all civilized countries, in its first stages, is to suppress it by confining the public forces and the operations of the government againt those in rebellion, and at the same time, extending encouragement and support to the loyal people, with a view to their co-operation in putting down the insurgents. This course is not only the dictate of wisdom, but of justice." Again he says:

"So the war carried on by the President against the insurrectionary districts in the Southern States, as in the case of the King of Great Britain in the American Revolution, was a personal war against those in rebellion, and with encouragement and support of loyal citizens with a view to their co-operation and aid in suppressing the insurgents, with this difference, as the war-making power belonged to the king, he might have recognized or declared the war at the begining to be a civil war, which would draw after it all the rights of a belligerent, but in the case of the President no such power existed; the war, therefore, from necessity, was

a personal war, until Congress assembled, and acted upon this state of things. Down to this period, the only enemy recognized by the government was the persons engaged in the rebellion, all others were peaceable citizens, entitled to all the privileges of citizens under the constitution. Certainly it cannot rightfully be said that the Pesident has the power to convert a loyal citizen into a belligerent enemy, or confiscate his property as enemy's property.

"Congress assembled on the call for an extra session on the 4th day of July, 1861. And among the first acts passed was one in which the President was authorized by proclamation to interdict all trade and intercourse between all inhabitants of states in insurrection and the rest of the United States, subjecting vessels and cargoes to capture and condemnation as prizes, and also to direct the capture of any ship or vessel, belonging in whole or in part to any inhabitant of a state whose inhabitants are declared by the proclamation to be in a state of insurrection, found at sea or in any part of the rest of the United States. Act of Congress of 13th of July, 1861, secs. 5 and 6. The fourth section also authorized the President to close any port in a collection district, obstructed so that the revenue could not be collected; and provided for the capture and condemnation of any vessel attempting to enter.

"The President's proclamation was issued on the 16th of August following, and embraced Georgia, North and South Carolina, part of Virginia, Tennessee, Alabama, Louisiana, Texas, Arkansas, Mississippi, and Florida.

"This act of Congress, we think, recognized a state of civil war between the government and the confederate states, and made it territorial."

We next proceed to show that the opinion of the minority of the Supreme Court, in the above case, is now recognized as the law. GILES, J., in *Jackson Insurance Company* v. *Stewart,* in the Circuit Court of the United States, for the State of Maryland, says: "On the 7th of September, 1861, this court decided that the President of the United States

had the right, by proclamation, to recognize the existence of a state of civil war; and that the war, from and after the date of such proclamation, existed between the states mentioned in the proclamation and the rest of the United States. Also, that the late war, when so declared and recognized by President's Proclamation, became a civil war, and imposed upon both the belligerents all the rights and consequences of such a war. This was one of the earliest decisions in regard to our late civil war, and the principles there enunciated have since been fully confirmed by the Supreme Court of the United States in the Prize Cases; 2 Black, 635.

"The justices of that court were unanimous as to all the consequences which resulted from a state of civil war, but the four dissenting judges were of opinion that the war began only after the proclamation of the President, of August 16th, 1861, passed in pursuance of the power conferred upon him by the Act of July 13th, 1861.

"As regards to the State of Tennessee, there can be no doubt that war existed in consequence of the proclamation of the President, of August 16th, 1861, and not before, as that State was not included in the previous proclamations." 6 Amer. Law Reg. N. S. 732.

TREAT, J., in *United States* v. *One Hundred Barrels of Cement*, in United States District Court, Eastern District of Missouri, says, "All commercial intercourse with Tennessee was interdicted from the date of the President's proclamation of August 16th, 1861, except so far as the President had relaxed, or might relax, such interdict, with respect to any particular part of the State, or with respect to specified persons." Again, he says, "The Act of 1861 and the proclamation recognize this as an organized insurrection, extending over the states and parts of states named." 3 Amer. Law Reg. N. S. 735.

The court of Chancery of Louisville, Kentucky, in the case of *Allen* v. *Russell*, 3 Amer. Law Reg. N. S. 361, held that the act of Congress of 13th of July, 1861, and the President's Proclamation of 16th of August, 1861,

recognized an insurrection amounting to civil war as existing.

The Supreme Court of the United States, at the December term, 1870, in the case of *Dean* v. *Nelson,* reported in American Law Times, held that the late rebellion became a civil war by the proclamation of the President, of the 16th of August, 1861, issued in pursuance of the Act of Congress of July 13th, 1861. The court say, "The war soon began to rage with severity, and all intercourse between the states in rebellion and the other states of the Union was not only interrupted, but was prohibited by President Lincoln's proclamation of August 16th, 1861, made in pursuance of the act of Congress of the 13th of July previous." 10 Wall. 158.

It was held by the Circuit Court of the United States, in the District of Oregon, in the case of *Chapelle* v. *Olney,* that the late rebellion did not become a civil war until the 16th of August, 1861. The case was decided at the December term, 1870, and is published in American Law Times.

DEADY, J., after quoting the fifth section of the Act of Congress of July 13th, 1861, says, "This act was passed with direct reference to the rebellion or insurrection then being organized and maintained in certain states (including Arkansas), against the authority and government of the United States. In pursuance of this act, the President, on August 16th, 1861, by proclamation, declared the inhabitants of certain states, including Arkansas, to be in a state of insurrection against the United States, excepting, among others, the inhabitants of such parts of such states as may maintain a loyal adhesion to the Constitution and Union, or may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of such insurgents.

"From and after the date of the proclamation of August 16th, 1861, all commercial intercourse was prohibited between the inhabitants of Arkansas and the people of the United States."

We are clearly of the opinion, from the above decisions, and our understanding and construction of the Constitution

of the United States, that the late rebellion did not become a civil war until it was made such by the proclamation of the President, on the 16th of August, 1861, made in pursuance of the act of Congress of the 13th of July, 1861, and that prior to that date, commercial intercourse between the citizens of Louisiana and the State of Indiana was lawful and would constitute a legal and valid consideration. As all the dealings between the parties to this action occurred prior to that date, it necessarily results that the cause of action in this case was not rendered unlawful and invalid by reason of a state of war.

But suppose that the opinion of the majority of the court in the Prize Cases was correct, and is still recognized as the law, how would that benefit the appellant? According to that decision, the rebellion did not become a civil war until the 27th of April, 1861, when the President issued his first proclamation of blockade. The last item in account of plaintiff was dated 15th of April, for money paid on draft of defendant. This payment was made before commercial intercourse became unlawful, under the above decision. It would deprive the appellant of the benefit of his corn received and credited on the 27th day of April, the day on which the proclamation was issued. Nor would the opinion of the majority of the court affect the statute of limitations in this case. Under the opinion of the majority of the court, the statute commenced on the 27th of April, 1861, while under the opinion of the minority of the court, it did not commence to run until the 16th of August, 1861. It is well settled by an unbroken line of decisions, both in England and in this country, that whenever a state of war existed, the debt and remedy were alike suspended—that the limitation ceased to run, and that the suspension of the debt and remedy did not cease, and the statute did not again commence to run, until the full restoration of peace, when the debt and remedy were fully restored.

But it is also maintained by the appellant that the court erred in overruling the demurrer to the complaint, because it affirm-

atively appeared on the face of the complaint that the cause of action had not accrued within six years next before the commencement of the action.

The rule was formerly well settled, that length of time was a proper ground for plea, and not for demurrer; but the very decided tendency of the later decisions is to hold, "that when the complaint discloses the fact that the plaintiff's right of action is barred by the statute of limitations, advantage may be taken of the bar by demurrer." This principle is discussed in the following cases: *Sturges* v. *Burton*, 8 Ohio St. 215; *McKinney* v. *McKinney*, 8 Ohio St. 423; *Chiles* v. *Drake*, 2 Met. Ky. 146; *Humbert* v. *Trinity Church*, 7 Paige, 195; 24 Wend. 587; Angell on Lim., 4th ed., sec. 29, p. 308; *Van Hook* v. *Whitlock*, 7 Paige, 375; Story Eq. Pl., secs. 378, 389, 390; *Wisner* v. *Barnet*, 4 Wash. C. C. 631; *Muir* v. *Trustees, &c.*, 3 Barb. Ch. 477; *Dunlap* v. *Gibbs*, 4 Yerg. 94; 1 Dan. Ch. Pr. 584; *Deloraine* v. *Browne*, 3 Bro. Ch. C. 633; *Thomas* v. *Harvie's Heirs*, 10 Wheat. 146; *Elmendorf* v. *Taylor*, 10 Wheat. 152; *Miller* v. *M'Intyre*, 6 Pet. 61; *Chapelle* v. *Olney*, Oregon C. C., Amer. Law Times.

But the law seems to be settled otherwise in this and many of the other states. In *Sipe* v. *Sipe*, 14 Ind. 477, the court say, "The time laid in the complaint should bring the case within the statute of limitations, and the proof should, perhaps, show that the acts complained of preceded the grant of letters of administration."

In *Bowman* v. *Mallory*, 14 Ind. 424, the court say that the statute of limitations should be pleaded, and refer to Perkins' Pr. 226.

In *Matlock* v. *Todd*, 25 Ind. 128, the court say, "But we do not decide the question, for the reason that it is not properly before us. It is raised on a demurrer to the complaint, and it has been held by this court, that in suits at law, to make the statute availing, it should be pleaded. *Bowman* v. *Mallory*, 14 Ind. 424."

In *Hanna, Adm'r* v. *The Jeffersonville R. R. Co.*, 32 Ind.

113, this court say, "It only remains to ascertain whether the point can be raised in this case by demurrer to the complaint. Ordinarily, the statute of limitations must be pleaded, though the fact appear by the averments of the complaint. The reason for this is, that usually there are exceptions to statutes of limitations, and the plaintiff should, therefore, have the opportunity of replying to the plea, so that he may show that the case is within any of the exceptions. To compel him to make these averments in the complaint would tend to inconvenient and needless prolixity. But in the case before us there are no exceptions, and consequently there is no reason why the defendant should plead the fact. There could be no reply avoiding the plea. The plaintiff brings upon the record all the facts concerning the matter that would be of service to either party, and the answer would be but a repetition of them, accomplishing no useful end. We think, therefore, that the question was properly raised by the demurrer, and that it was correctly sustained."

But if the statute of limitations was properly raised by demurrer, it would not avail the appellant in this case. The complaint shows that the plaintiff then was, and had been since 1858, a citizen of the State of Louisiana, and that the defendant then was, and during the war had been, a citizen of the State of Indiana. It was the duty of the court below, as it is of this court, to take judicial notice of the fact that the State of Louisiana was in a state of insurrection against the United States, and that the State of Indiana maintained a loyal adhesion to the Constitution and Union.

In the case of *Chapelle* v. *Olney, supra,* the court say, " The plaintiff is not required to anticipate the defense of the statute of limitations, nor could the defendant at common law claim the benefit of it, unless he pleaded it. But under the code, when it appears from the statement of the cause of action in the complaint, that it did not accrue within the limitation prescribed by law, the defense may be made by demurrer. In such case I suppose the plaintiff may anticipate the defense by

stating in the complaint any special matter which he relies upon to take the case out of the statute, or otherwise the demurrer will be sustained. But, as in this case, if such special matter is within the judicial knowledge of the court, it need not be stated in the complaint.

" Here it appears upon the face of the complaint that the action was not commenced within six years from the time it accrued. If this were all, a demurrer that the action had not been commenced within the time limited, would be a good defense. But it is also judicially known to the court that the inhabitants of Arkansas—which description includes the plaintiff, under the allegations of the pleadings—were in a state of insurrection against the United States, for a suffi-cient period after the action accrued, to take the case out of the statute. But at this point the defendant asks the court to assume that Cross county was, during this time, within the exception in the proclamation, that is, was either loyal to the Union, or occupied by the forces of the United States, and, therefore, not in a state of insurrection. Now, this is a matter of which the court cannot take judicial notice. The proclamation declares the whole state to be in a state of insur-rection. No particular exceptions to this condition are recog-nized as then existing. The exceptions made relate to no particular person or place, but only to such persons or places as may possibly then or thereafter—particularly thereafter— ' maintain a loyal adhesion to the Union and Constitution,' or be ' occupied and controlled by the forces of the United States.' The exception in regard to the State of Virginia is positive and definite. It relates to the inhabitants of that part of the state lying west of the Alleghany mountains. If, then, the particular portion of Arkansas in which the plaintiff resided during the hostilities between the United States and the southern confederacy, was, as a matter of fact, loyal to the Union, or occupied and controlled by the United States forces, and, therefore, not in a state of insurrection, and the defendant relies upon these facts to bring the case within the

bar of the statute, he should plead them, and be prepared to prove them on the trial." It is quite clear that the court committed no error in overruling the demurrer to the complaint.

The appellant, in the second paragraph of his answer, pleaded the statute of limitations. The appellee attempted to avoid the statute by the matters alleged in the fourth paragraph of the reply, to which the appellant demurred. The demurrer was overruled, and an exception taken, and this ruling is assigned for error. We have reached the conclusion that the late rebellion did not become a civil war until the 16th of August, 1861. The decision of the point now under consideration will depend upon the legal consequences that resulted from a state of civil war, and this divides itself into two propositions : the first is, whether the law of nations applies to and governs a civil war, in the same manner and to the same extent that it does to a foreign war ; and the second is, whether the war suspended the plaintiff's right of action during the existence of the war.

Wheaton says, "But the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other, and even as respects neutral nations." The authorities are all to the same effect. Prize Cases, 2 Black, 635.

In the case of *Hanger* v. *Abbott*, 6 Wall. 532, the court say : " In former times the right to confiscate debts was admitted as an acknowledged doctrine of the law of nations, and in strictness it may still be said to exist, but it may well be considered as a naked and impolitic right, condemned by the enlighted conscience and judgment of modern times. Better opinion is that executed contracts, such as the debt in this case, although existing prior to the war, are not annuled or extinguished, but the remedy is only suspended, which is a necessary conclusion, on account of the inability of an alien enemy to sue or sustain, in the language of the civilians, *a persona standi in judicio.* * * *

" Total inability on the part of an enemy creditor to sustain

any contract in the tribunals of the other belligerent exists during war, but the restoration of peace removes the disability, and opens the doors of the courts. Absolute suspension of the right, and prohibition to exercise it, exist during war by the law of nations, and if so, then it is clear that peace cannot bring with it the remedy if the war is of much duration, unless it also be held that the operation of the statute of limitations is also suspended during the period the creditor is prohibited, by the existence of the war and the law of nations, from enforcing his claim."

An alien enemy cannot sue, nor can he be heard as claimant in the courts of the belligerent captors. *The Adventure,* 8 Cranch, 221; *The Anne,* 3 Wheat. 435; *The Mariana,* 6 C. Rob. Admr. 24; *The Schoone Sophie, id,* 138; *The Falcon, id.* 194; *The Eliza Ann,* 1 Dods. 244; *The Flotina, id.* 450; 3 Phillm. Int. Law, sec. 461; *The Juffrow Maria Schroeder,* 3 C. Rob. Adm. 147; *The Pearl, id.* 199; *The Boedes Lust, id.* 207; *The Eenrom,* 2 *id.* 1; *The Frances,* 8 Cranch. 354; *The Frances, id.* 418; *Bolchos* v. *Darrell,* Bee, 74; *Rapalje* v. *Emory,* 5 Dall. 51; *Ware* v. *Hylton,* 3 *id.* 199; *The Rebeckah,* 1 C. Rob. Adm. 190; *The Rapid,* 1 Gallis. 295; *Jecker* v. *Montgomery,* 18 How. U. S. 110; *Griswold* v. *Waddington,* 16 Johns. 438.

The court of appeals of Kentucky in *Norris* v. *Doniphan,* held that a citizen of Arkansas could not maintain an action in the courts of Kentucky by reason of the existence of war.

The next question arising in the record is, when did the war end and the statute of limitations commence running, in this case?

In *United States* v. *Anderson,* 9 Wall. 56, the question arose, when was the rebellion entirely suppressed? The circumcumstances were these; what is called the captured and abandoned property act passed March 12th, 1863, 12 Stat. at Large, 820, gave to the loyal owners of such property a right to bring suit against the United States in the court of claims to recover the proceeds thereof, " at any time within

two years after the suppression of the rebellion." Anderson, a resident of Charleston, South Carolina, on June 5th, 1868, commenced an action to recover the proceds of certain cotton seized and sold by the United States. The defense was that the action was barred by the limitation in the act of March 12th, 1863, or in other words, that the action was not commenced within the two years after the suppression of the rebellion.

By an act of Congress passed March 2d, 1867, (14 Stat. at Large, 422) it was declared that the act passed June 20th, 1864, (13 Stat. at Large, 144) to increase the pay of the army, should be continued in full force and effect for three years after the close of the rebellion announced by the President of the United States by proclamation bearing date August 20th, 1866.

The court held that the limitation of two years did not commence to run until the rebellion was suppressed throughout the whole country, and that the proclamation of August 20th, 1866, was the first official declaration on the part of the executive that the rebellion was wholly suppressed. The court also held that the act of March 2d, 1867, was so far a legislative recognition of the proclamation declaring the insurrection at an end thoughout the United States on August 20th, 1866, and that that day would be considered as the day when the rebellion was suppressed, as respects the rights intended to be secured by the captured and abandoned property act.

The court also expressed the opinion that there is no reason why this declaration of Congress should not be received as settling the question of when the rebellion was suppressed, wherever private rights are affected by it. But the court premised this dictum by the declaration that it did not intend to decide any more than the question, when was the rebellion entirely suppressed, within the meaning of the limitation clause in the captured and abandoned property act?   ·

This decision is generally regarded as decisive of the question when peace was restored, and when the legal consequences of a state of peace became operative. This deci-

sion seems to be regarded as binding upon the circuit and district courts, and they have applied the law as announced by the Supreme Court as applicable to persons claiming under the captured and abandoned property act to suits between citizens where " private rights " are involved.

The next question presented for our consideration and decision is, what effect did the occupation of the city of New Orleans, on the 6th of May, 1862, by the forces of the United States, have upon the rights of the parties to this action? By the 5th section of the act of Congress of the 13th of July, 1861, it was enacted, that " whenever " the militia called forth by the President had failed to disperse insurgents in any state against the national authority, it should be lawful for the President, by proclamation, to declare that the inhabitants of such state, or part of a state, were in a " state of insurrection against the United States;" and thereupon the statute proceeded:

" All commercial intercourse by and between the same and citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue; and all goods and chattels, wares and merchandise, coming from said state or section into the other parts of the United States, and all proceeding to such state or section, by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such state or section, be forfeited to the United States."

The section contained, however, this proviso: " That the President may, in his discretion, license and permit commercial intercourse with any such part of said state or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

President Lincoln, on the 16th of August, 1861, made such proclamation as the act itself authorized, declaring that the inhabitants of several states, which he named, including Louisiana, "except the inhabitants of that part of Virginia lying west of the Alleghany mountains, and such other parts of that state, and the other states hereinbefore named, as may maintain a loyal adhesion to the union and constitution, or may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of such insurgents, are in a state of insurrection against the United States, and that all commercial intercourse between the same and the inhabitants thereof, with the exceptions aforesaid, and the citizens of other states and other parts of the United States is unlawful and will remain unlawful until such insurrection shall cease or has been suppressed," &c.

The proclamation of the President embraced the entire State of Louisiana, and included all the inhabitants thereof. There were no exceptions made as to places or persons in the said state. The Supreme Court of the United States, in the matter of *The Venice,* 2 Wal. 258, say:

"While these transactions were in progress (April, 1862), the war was flagrant. The States of Louisiana and Mississippi were wholly under rebel dominion, and all the people of each state were enemies of the United States. The rule which declares, that war makes all the citizens or subjects of one belligerent enemies of the government and of all the citizens or subjects of the other, applies equally to civil and to international wars."

The inhabitants of the States of Lousiana and of Indiana were enemies, and all commercial intercourse between them was prohibited and unlawful, unless they came within the exceptions named in the proclamation of the President above quoted. It is not claimed that any part of the State of Louisiana or of the inhabitants thereof, except the city of New Orleans and its inhabitants, came within the exception named in the proclamation. The occupation of the city of

New Orleans by the forces of the United States became complete on the 6th day of May, 1862.

The question arises, what was the legal effect of such occupation? This depends upon the construction to be placed upon the proviso to the fifth section of the act of Congress of 13th of July, 1861, and the exceptions contained in the proclamation of the President on the 16th of August, 1861. It will be perceived that the decisions of the Supreme, circuit, and district courts of the United States have not been uniform and consistent, and this will render necessary an examination of all these decisions, with the view of ascertaining the recognized and established doctrine on this subject. The want of uniformity and the apparent conflict in the decisions of the federal courts seem to have resulted from the fact that some of the decisions are based upon the proclamation of the President, while others are based on the fifth section of the act of Congress of 13th of July, 1861. The proclamation does not conform to the act of Congress. The proviso to the 5th section refers solely and expressly to commercial intercourse between the inhabitans of a state or part of a state that may be declared to be in a state of insurrection. The act of Congress makes it the duty of the President, in a certain contingency therein named, "to declare that the inhabitants of such 'state, or any section or part thereof, where such insurrection exists, are in a state of insurrection against the United States; and thereupon all commercial intercourse by and between the same, and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue;" and the President having declared such state and inhabitants to be in a state of insurrection, he is invested by the proviso with the discretionary power to "license and permit commercial intercourse with any such part of said state or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far

as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury." The evident purpose of Congress was to place all the inhabitants in a state of insurrection and render unlawful all intercourse, except as the President might by special license, or permit, allow trading. The exception does not apply to anything except trading by special license, and does not release the inhabitants from any other disability produced by a state of war. The proclamation of the President applies the exception to the condition of insurrection, and not to commercial intercourse by special license after the inhabitants are declared to be in a state of insurrection. The construction of the act of Congress and proclamation of the President was first involved in the matter of *The Venice,* 2 Wal. 258, where the court say:

"This legislative and executive action relates, indeed, mainly to trade and intercourse between the inhabitants of loyal, and the inhabitants of insurgent parts of the country, but by excepting districts occupied and controlled by national troops from the general prohibition of trade, it indicated the policy of the government not to regard such districts as in actual insurrection, or their inhabitants as subject, in most respects, to treatment as enemies. Military occupation and control, to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient; but substantial, complete, and permanent. Being such, it draws after it the full measure of protection to person and property consistent with a necessary subjection to military government. It does not, indeed, restore peace, or in all respects, former relations, but it replaces rebel by national authority, and recognizes, to some extent, the conditions and responsibilities of national citizenship."

This is the earliest decision of the Supreme Court on the question under consideration. It is not full, accurate, or perspicuous. It decides that the occupation of New Orleans by the forces of the United States did not restore peace or the former relation, but that it recognized to some extent the

conditions and responsibilities of national citizenship. But we are not informed what condition and responsibilities are recognized, or to what extent they are so recognized. If there is anything that is clearly settled by this decision, it is that a permanent occupation draws after it "the full measure of protection of persons and property."

The same court, at the same term, in the matter of *The Circassian,* held that the capture of the forts and occupation of the city of New Orleans did not terminate the blockade of New Orleans, but, on the contrary, made it more complete and absolute. See 2 Wal. 135.

In the subsequent case of *The Reform,* 3 Wal. 617, the principal defense upon the merits was, that the vessel, with the cargo, was engaged, at the time of the seizure, in a lawful voyage under a license from the Secretary of the Interior, issued by the express authority of the government. The court say:

"Such a defense, unquestionably, may be valid, and if fully proved, the decree of the circuit court must be affirmed. Authority was conferred upon the President, by a proviso of the section under consideration, to license and permit, in his discretion, commercial intercourse, in the interdicted states or places, in such articles, and for such time, and by such persons, as he might think most conducive to the public interests; but all such intercourse was to be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

Again, it is said by the court: " Proclamation of the President, of the sixteenth of August, 1861, which declared that certain states and parts of states were in insurrection, expressly excepted from that condition those districts, or parts of the same, which might be 'from time to time occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents.' Intercourse for commercial purposes was not prohibited with such places or districts while so occupied and controlled. They were not regarded, as this court said in the case of *The Venice,* 'as in

actual insurrection, or their inhabitants as subject in most respects to treatment as enemies.'

"Such intercourse, however, with any such state, place, or district, so occupied and controlled, was absolutely forbidden, unless the person or persons conducting it were furnished with a license and permit of the President, and conformed in all respects to the treasury rules and regulations."

The court held that the Secretary of the Interior possessed no power to issue a license and permit, and that the vessel and cargo were lawfully subject to seizure.

This decision settles two propositions that have an important bearing upon the question under consideration. The first is, that all intercourse with a place "occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents" was prohibited, except "intercourse for commercial purposes."

The second is, that "intercourse for commercial purposes was absolutely forbidden, unless the person or persons conducting it were furnished with a license and permit of the President, and conformed in all respects to the treasury rules and regulations."

The President, by his proclamation, had declared the entire State of Louisiana and all of her inhabitants to be in a state of insurrection against the United States, which made all of such inhabitants the enemies of the government and all the inhabitants of the states that adhered to the government, and had prohibited all kinds of intercourse except commercial intercourse, under the license and permit of the President. If such was the condition of things, upon what principle can it be maintained that such places were not "in actual insurrection," or "their inhabitants" were not "subject in most respects to treatment as enemies." If such places and their inhabitants were not in insurrection, the government possessed no power under the laws of war, the acts of Congress, or the constitution of the United States, to blockade the ports or prohibit intercourse between them and the inhabitants of the other states. The constitution of the United States ex-

pressly provides, that "the citizens of such state shall be entitled to all privileges and immunities of citizens of the several states." The inhabitants of New Orleans could not be deprived of those privileges and immunities, unless they were in a state of insurrection against the government of the United States. This court is unwilling to believe that the highest judicial tribunal of this country intended to hold that the government of the United States had blockaded the ports and deprived the inhabitants of one of the states of this Union of the privileges and immunities secured to them by the paramount law of the land, when such state or part thereof was not in actual insurrection, and when the inhabitants thereof were not subject to treatment as enemies, but we prefer to believe that the expression used in the case of *The Venice*, and afterwards referred to in the case of *The Reform*, was a loose and unguarded expression, which was not at all necessary to the decision of the cases.

The Supreme Court, in the case of *The Peterhoff*, 5 Wal. 28, said: "It has been held, by this court, that persons residing in the rebel states at any time during the civil war, must be considered as enemies, during such residence, without regard to their personal sentiments or dispositions. *The Prize Cases*, 2 Black, 635; *The Venice*, 2 Wal. 258; *Mrs. Alexander's Cotton, id.* 404.

"But this has never been held in respect to persons faithful to the Union, who have escaped from those states, and have subsequently resided in the loyal states or in neutral countries. Such citizens of the United States have lost no rights as citizens by reason of temporary and constrained residence in the rebellious portion of the country."

In this case the doctrine is broadly stated, that persons residing in the rebel states at any time during the civil war must be considered enemies during such residence, without regard to their personal sentiments or dispositions.

It was held by the Supreme Court, in the case of the *United States* v. *Weed*, 5 Wal. 62, that the property seized was not liable to seizure, because the owner was a loyal citizen of New

Orleans and had a license and permit from the President, in conformity to the rules and regulations prescribed by the Secretary of the Treasury.

The Supreme Court, in the case of *The Sea Lion*, 5 Wal. 630, held that the vessel was liable to capture, for the reason that the owner was not protected by a license and permit of the Secretary of the Treasury; that the President alone possessed the power, by his license and permit, to render lawful commercial intercourse with the inhabitants of the rebellious states.

The Supreme Court, in the case of *McKee* v. *The United States*, 8 Wal. 163, say: "It is a familiar principle of public law, that unlicensed business intercourse with an enemy during a time of war is not permitted. Congress, therefore, in recognition of this principle, when it declared on the 13th of July, 1861, that commercial intercourse between the seceding states and the rest of the United States should cease and be unlawful, after the proclmation of the President that a state of insurrection existed, authorized the President, in his discretion, to license trade. But in so far as it was licensed, it was to be conducted in accordance with the regulations prescribed by the Secretary of the Treasury. The President proclaimed the fact of insurrection, and provided for a limited commercial intercourse, and the Secretary of the Treasury fixed the manner in which this intercourse should be carried on."

Judge TREAT, in the case of *The United States* v. *One Hundred Barrels of Cement*, 3 Am. Law Reg. N. S. 742, states the law thus: "Hence the rule, as laid down by publicists, that an alien enemy cannot sue, is so phrased because an alien may be in a state of amity as well as of enmity. As his *persona standi* depends on his friendly or hostile status, the term 'enemy' is used in connection with the word alien, to designate that hostile status. The claimants here are not aliens, they are not technically enemies, they are only 'enemies in a qualified sense,' as Justice NELSON has correctly said. They still owe paramount allegiance to the United States, are not citizens of any other recognized power. They are *de jure* subject to the United States laws. Those laws

forbid them to carry on commercial intercourse with the loyal states, except on the conditions named. The prohibition rests not on the law of nations, but on municipal statute or act of sovereignty, and the exception to the general prohibition is created by the same act. It was probably the intent of Congress to allow such discriminations to be made between the loyal and disloyal in the insurrectionary states, as the exigencies of the government would from time to time permit. Hence the power lodged in the President by the terms of the proviso to the fifth section, under which the permit in this case was obtained; also the terms of section 8, as to remission of forfeitures. The condition of *quasi* enmity, under which all the inhabitants of Tennessee were placed by the proclamation, was subject therefore to those exceptions, as to districts and persons, which the President might make from time to time. The temporary disqualification covering all its inhabitants is removed as to those who have special exemptions granted to them, which exemptions are evidenced by license duly obtained. Alienage the President could not remove, if it existed, but the legal status of *quasi* enmity, or hostility, as to districts, or individuals thereof, he is especially empowered to remove. Hence, the simple fact that the claimants are citizens of Tennessee, might, in the absence of any other fact, deprive them temporarily of the right to sue, or appear as claimants here; but when the other fact is proved, that they have been relieved of that temporary disability, their *persona standi in judicio* must be considered as fully restored, Such is the rule under this statute, and such is also the rule, as will be shown, in analogous cases during foreign wars."

The same learned judge, in the case of *United States* v. 129 *Packages*, 2 Am. Law. Reg. N. S. 430, says: "In short, the status of the country, as to peace or war, is legally determined by the political, and not the judicial department. When the decision is made, the courts are concluded thereby and bound to apply the legal rules which belong to that condition. The same power which determines the existence of war or insur-

rection, must also decide when hostilities have ceased; that is, when peace is restored. In a legal sense, the state of war or of peace is not a question *in pais* for courts to determine. It is a legal fact ascertainable only from the decision of the political department. *Gelston* v. *Hoyt,* 3 Wheat. 246; *The U. S.* v. *Palmer, id.* 610; *The Divinia Pastora,* 4 Wheat. 52; *The Neustra Senora de la Caridad, id.* 497; *The Santissima Trinidad,* 7 Wheat. 283; *Martin* v. *Mott,* 12 Wheat. 19; *Rose* v. *Himely,* 4 Cranch, 241 ; *Foster* v. *Neilson,* 2 Pet. 253; *Garcia* v. *Lee,* 12 Pet. 511 ; *M'Elmoyle,* v. *Cohen* 13 Pet. 312; *Luther* v. *Borden,* 7 How. U. S. 1; *Kennett* v. *Chambers,* 14 How U. S. 38; *Christy* v. *Scott, id.* 282.

"Under the act of July 13th, the President, on the 16th of August, 1861, proclaimed Tennessee in a state of insurrection. The legal status thus determined must remain so long as the condition of hostility continues. He has never made a counter proclamation, nor has peace been officially announced. As a legal condition, that status is independent of actual daily strife in arms. A legal condition of hostilities may exist between this and a foreign nation long after the last battle has been fought between the opposing armies. That condition ceases when peace is concluded through competent authority, not before."

The circuit court of the United States for the district of Connecticut, in case of *Sommes* v. *The Fire Ins. Co.,* 4 Am. Law Review, 175, says : "When war has existed between the United States and a foreign country, its termination is easily ascertained by reference to the treaty of peace which follows it, and which is consummated by the President, acting by and with the advice of two thirds of the Senate. As no such treaty did, or could, mark the close of this civil war, we must look to the action of the President or Congress, or both, and from that action ascertain when the war ended, and when the legal consequences which flowed from it ceased to act in any given case."

In the case of *Jackson Ins. Co.* v. *Stewart,* in the circuit court of the United States for the State of Maryland, GILES,

Justice, says: "It is a well settled principle, that contracts made before war are only suspended by the war, whereas contracts made during the war are void. This principle is fully recognized by the Supreme Court in regard to our late civil war.

"In ancient times private property of alien enemies, and debts of every kind, were confiscated to the state. Happily all this has been changed in modern times, and now, while contracts made during war between alien enemies are absolutely void, being against public policy, private interests are protected, and *bona fide* contracts made before the breaking out of a war are suspended during its existence, but revive at its termination. To the honor of the United States and Great Britain, be it said that these rights have always been respected by them.·

"It has been repeatedly decided, by both state and federal courts, that where, by a legislative enactment, parties are prevented from prosecuting their claims, the interval during which such prevention lasts is not to be counted as part of the time allowed by the statute of limitations. Now, the power to make war and peace is, by the constitution of the United States, delegated exclusively to the federal government; and as during the war the plaintiff, being a corporation of the State of Tennessee, had no right to bring· suit against the defendant, who was a citizen of Maryland, the Maryland statute of limitations was suspended during such period.

"The general rule unquestionably is, that where the statute of limitations has once begun to run, no subsequent disability will arrest it. But we have already seen that a legislative enactment supends the running of the statute, and the same result follows from the declaration of war by the supreme power of the land.

"For it is a well recognized principle of the law of nations, that the right of a creditor to sue for the recovery of his debt is not extinguished by the war; it is only suspended during the war, and revives in full force on the restoration

of peace. A war then certainly existed between Tennessee and the federal government, from the President's proclamation of August 16th, 1861, and although a civil war, yet, according to the decision of the Supreme Court in the *Prize Cases*, it carried with it all the consequences and disabilities of a public war, one of which (as we have seen) was the suspension of the right to sue during the war. It follows, therefore, that the plaintiff in this case could have instituted no proceedings in this court until peace was proclaimed by the President's proclamation of June 13th, 1865.

"This suspension being by the exercise of the paramount authority of the government, cannot be held to work a forfeiture of a plaintiff's cause of action; but that his right to sue, suspended by the war, revived when it ceased. And as it has not been three years from the maturity of the cause of action to the commencement of the war, and from the termination of the war to the commencement of this suit, the suit is not barred by limitation, and the demurrer is, therefore overruled."

In *Brown* v. *Hiat*, in the circuit court of U. S., district of Kansas, reported in Am. Law Times for March, 1871, which was an action brought by a person who was a citizen of Virginia during the war, against a person who was a citizen, during said time, of Kansas, the defendant pleaded the statute of limitations, to which the plaintiff replied the existence of war.

DILLON, C. J., says: "In arriving at this conclusion, viz., that unlicensed intercourse during the war was unlawful, and that pre-existing contracts are only suspended by it, the Supreme Court has frequently had occasion to refer to the legislation of Congress, and particularly to the important act of July 13th, 1861, the essential prohibitions of which continued in force during the whole period of the rebellion.

"It is important to notice with care the provisions of the fifth section of this statue (12 Stat. at Large, 225, 257).

"It authorizes the President to proclaim and declare, 'inhabitants' of certain states or any section or part thereof, to be in a state of insurrection against the United States, and there-

upon all commercial intercourse, by and between the same, and the citizens thereof and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue; and all goods, etc., coming from said state or section into the other parts of the United States, and all proceeding to such states or section by land or water, shall, together with the vessel or vehicle conveying persons to or from such state or section, be forfeited to the United States.

"Then follows a provision authorizing the President, in his discretion and for the public interest, to permit intercourse under regulations to be prescribed by the Secretary of the Treasury.

"The statute is a valid exercise of legislative power, for the Congress of the United States was not, by the rebellion, deprived of the power to legislate in this manner with a view to its suppression.

"Its prohibition of intercourse is as broad as the prohibition of the law of nations in the case of a war between independent states. By recurring to the act, it will be seen to extend to 'all' unlicensed 'commercial intercourse.'

"It admits of no exceptions as to persons, for it prohibits intercourse not simply between citizens of the insurrectionary states who were in fact disloyal, and citizens of loyal states, but it makes unlawful all unlicensed intercourse between all citizens of the states of hostile sections. All goods are prohibited to come from the insurrectionary sections into the other parts of the United States, and all goods are prohibited likewise from being sent from loyal to disloyal states. Vessels and vehicles are prohibited from conveying persons to or from the respective states or sections.

"It is obvious that this act contemplates a condition of entire non-intercourse of a pacific character between the two opposing sections, except such as should be authorized by the President 'for the public interest.'

"What is the necessary effect and consequence of this condition? It is the same as when a war existed between inde-

pendent nations. All existing contracts between citizens of the different sections are suspended; this from necessity, because the act forbids all intercourse, and intercourse is essential in order to fulfil, or perform, or enforce contracts. The courts of the one section are shut, by the act of Congress, to the people of the other, for citizens of the insurrectionary states are forbidden to come into the other states, or hold any intercourse with their people, and without this, suits cannot be instituted or carried on, and the same is true as to citizens of the loyal states.

"It is manifest from the foregoing that the complainant, was he ever so loyally disposed towards the Union, had, by reason of his domicil in a state declared to be in insurrection, no right to institute or maintain, during the war, a suit in the courts of the United States or of Kansas, for the recovery of his debt against the respondent. In a proceeding of this nature the courts cannot, under the act of July 13th, 1861, inquire whether the particular plaintiff was loyal to the Union or aided the rebellion; for if he was a citizen of a rebellious state he is regarded as an enemy, irrespective of his personal sentiments, sympathy, or acts. *Mrs. Alexander's Cotton*, 2 Wal. 404; *The Venus*, 8 Cranch, 253; *The Indian Chief*, 3 C. Rob. Adm. 12; *The Friendschaft*, 4 Wheat. 105. We may observe that it has been accordingly held by courts and judges of great respectability, that citizens of rebellious states could not, during the recent war, maintain suits in the courts of the other portions of the United States."

In the case of *Chapelle* v. *Olney, supra,* the court say, "From and after the date of August 16th, 1861, all commercial intercourse was prohibited between the inhabitants of Arkansas and the people of the United States, and the transportation or removal of property to or from Arkansas and other parts of the United States, not declared to be in a state of insurrection, was punishable by forfeiture thereof. For the time being, the plaintiff was a citizen or inhabitant of a country at war with the United States, and therefore could not maintain an action in the courts within this State,

against the defendant, to secure this money. 1 Kent Com. 66. The plaintiff's remedy was suspended until the cessation of hostilities and the restoration of peace and lawful intercourse between the people of the two countries. *Ibid*, 68.

"The next question to be considered is, when did this state of insurrection or hostilities cease? Without stopping to consider whether the President has any power to declare the beginning or ending of an insurrection, except in pursuance of legislative authority, and conceding that all power over questions of war and peace, domestic or foreign, is vested by the constitution in Congress, except that vested in the treaty-making power, I am of the opinion that the authority conferred upon the Executive by the act of July 13th, 1861, to declare Arkansas in a state of insurrection, impliedly authorized him, if the state of things amounting to such insurrection should cease or change, to then declare it at an end, unless in the meantime Congress had otherwise provided. Assuming that the insurrection as to Arkansas was at an end from and after the proclamation in April 2d, 1866, the remedy of the plaintiff, the right to sue defendant for his money, was suspended for four years, seven months, and sixteen days. Deducting this period from the time between the accruing of the right of action and the commencement of this action, leaves five years, one month, and one day, a period of eleven months and twenty-nine days less than that allowed by law within which to begin the action. This view of the matter is the most favorable one that can be taken for the defendant, for there is no ground upon which the court can assume that the insurrection, including the prohibition of intercourse between the people of the United States and Arkansas terminated at an earlier date. Actual war, the marching of hostile forces, and the conflict of opposing armies in battle, may have ceased sooner, but this proclamation is the earliest act of the government to which the attention of the court has been called, which purports or has the effect to relieve the inhabitants of Arkansas from the status.

of insurrection and consequent non-intercourse, in which they were placed by the proclamation of August 16th, 1861."

The United States Circuit Court for the District of Connecticut, in the case *supra*, say, " I have already shown that by the rules of public law universally recognized among civilized nations, as well as by the decisions of our own courts, the existence of this war suspended all contracts between the citizens of the respective belligerents entered into before it commenced.   It rendered, for the time being, all commercial intercourse between the citizens of the two sections unlawful, and converted them into enemies.   But in addition to this, Congress passed an act July 13th, 1861, authorizing the President; in certain cases, by proclamation, to declare the inhabitants of a state in insurrection against the United States, whereupon all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, should become unlawful.   In pursuance of this statute, the President, on the 16th of August, 1861, issued his proclamation declaring the inhabitants of certain states, including Mississippi, in insurrection against the United States,   By force of this proclamation, then, and the statute authorizing it, as well as by the force of the legal effect of the war then existing, all pre-existing contracts between the people of the respective belligerents, including the right to enforce them by judicial proceedings, were thenceforth suspended."

Again, the court say, " It follows from these principles that the contract upon which this suit is founded, though suspended, during the war, while intercourse between the citizens of the belligerent sections was unlawful, revived on the 13th of June, 1865, and from that date was in full force. From that time there has been no legal obstacle to its enforcement."

We have heretofore shown that the Supreme Court of the United States has decided that peace was not restored until the 20th of August, 1866, and, consequently, that that is to be regarded by the courts as the time when the statute of limita-

tions would commence to run upon debts that were created prior to, and were suspended by, the war, instead of the 13th of June, 1865, as fixed by the court in the Connecticut case.

In the case of *Texas* v. *White*, 7 Wal. 726, the Supreme Court of the United States held that the State of Texas continued to be a state, and a state of the Union, during the continuance of the war. After having established that proposition, CHASE, C. J., proceeded to consider the relation that the state and its people sustained to the United States. He says, "And it is by no means a logical conclusion, from the premises which we have endeavored to establish, that the governmental relations of Texas to the Union remained unaltered. Obligations often remain unimpaired, while relations are changed. The obligations of allegiance to the state, and of obedience to her laws, subject to the Constitution of the United States, are binding upon all citizens, whether faithful or unfaithful to them; but the relations which subsist while these obligations are performed are essentially different from those which arise when they are disregarded and set at naught. And the same must necessarily be true of the obligations and relations of states and citizens to the Union. No one has been bold enough to contend that, while Texas was controlled by a government hostile to the United States, and in affiliation with a hostile confederation, waging war upon the United States, senators chosen by her legislature, or representatives elected by her citizens, were entitled to seats in Congress; or that any suit, instituted in her name, could be entertained in this court. All admit that, during this condition of civil war, the rights of the state as a member, and of her people as citizens of the Union, were suspended. The government and the citizens of the state, refusing to recognize their constitutional obligations, assumed the character of enemies, and incurred the consequences of rebellion."

CHASE, C. J., in the case of *Thorington* v. *Smyth*, 4 Am. Law Rev. 380, says, "We have already seen that the people of the insurgent states, under the confederate government, were, in legal contemplation, substantially in the same condi-

tion as inhabitants of districts of a country occupied and con-
trolled by an invading belligerent. The rules which would
apply in the former case would apply in the latter, and, as
in the former case, the people must be regarded as subject to
a foreign power, and contracts among them be interpreted
and enforced with reference to laws imposed by the con-
queror; so in the latter case the inhabitants must be regarded
as under the authority of the insurgent belligerent power,
actually established as the government of the country, and
contracts made with them must be interpreted and enforced
with reference to the condition of things created by the acts
of the governing power."

The contract sued on in the above case was made between
parties residing within the so-called Confederate States, and
during the war. The question in the case was, whether such
a contract could be enforced at all in the courts of the United
States, and the Supreme Court held that it could be enforced,
for the reason that the "inhabitants must be regarded as
under the insurgent belligerent power actually established as
the government of the country." If this was the condition
of the inhabitants of the insurgent states, they could have no
personal standing in our courts.

We will refer to but one more decision of the Supreme
Court of the United States, and in our opinion the principles
therein enunciated are decisive of the question under con-
sideration. It is the case of *The Grapeshot,* 9 Wal. 129.
The facts upon which the decision of the court was based
were these:. Louisiana became involved in the rebellion, and
the courts and officers of the United States were excluded
from its limits. In 1862, the city of New Orleans was occu-
pied and controlled by the forces of the United States, by
which the national authority had been re-established in the
state, though still liable to be overthrown by the vicissitudes
of war. On the 20th of October, 1862, the President, by
proclamation, instituted a provisional court for the state.
Upon the restoration of civil authority in the state, the pro-
visional court, limited in duration, according to the terms of

Perkins *v*. Rogers.

the proclamation, by that event, ceased to exist. On the 28th of July, 1866, Congress enacted that all suits, causes, and proceedings in the provisional court, proper for the jurisdiction of the circuit court of the United States for the eastern district of Louisiana, should be transferred to that court, and heard and determined therein; and that all judgments, orders, and decrees of the provisional court, in causes transferred to the circuit court, should at once become the orders, judgments, and decrees of that court, and might be enforced, pleaded, and proved accordingly.

The question involved in this case was, whether the establishment by the President of a provisional court was warranted by the Constitution. Upon that question, CHASE, C. J., speaking for the court, says, "That the late rebellion, when it assumed the character of civil war, was attended by the general incidents of a regular war, has been so frequently declared here, that nothing further need be said on that point.

"The object of the national government, indeed, was neither conquest nor subjugation, but the overthrow of the insurgent organization, the suppression of insurrection, and the re-establishment of legitimate authority. But in the attainment of these ends, through military force, it became the duty of the national government, wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the national forces, to provide, as far as possible, so long as the war continued, for the security of persons and property, and for the administration of justice.

"The duty of the national government, in this respect, was no other than that which devolves upon the government of a regular belligerent, occupying, during war, the territory of another belligerent. It was a military duty, to be performed by the President as commander-in-chief, intrusted as such with the direction of the military force by which the occupation was held.

"What that duty is, when the territory occupied by the

national forces is foreign territory, has been declared by this court in several cases arising from such occupation during the late war with Mexico. In the case of *Leitenzdorfer* v. *Webb*, 20 How. 176, the authority of the officer holding possession for the United States to establish a provisional government was sustained; and the reasons by which that judgment was supported apply directly to the establishment of the provisional court in Louisiana. The cases of *Jecker* v. *Montgomery*, 13 *Id.* 498; and 18 *Id.* 110, and *Cross* v. *Harrison*, 16 *Id.* 164, may also be cited in illustration of the principles applicable to military occupation.

"We have no doubt that the provisional court of Louisiana was properly established by the President, in the exercise of his constitutional authority during war; or that Congress had power, upon the close of the war, and the dissolution of the provisional court, to provide for the transfer of cases pending in that court, and of its judgments and decrees, to the proper courts of the United States."

It has been claimed that the establishment of the provisional court was conclusive evidence that civil authority had been restored, and that this restored the plaintiff to all the rights and privileges of a citizen of the United States; but an examination of the above decision will conclusively demonstrate that this position is wholly unfounded. By the proclamation, the court was only to exist during the continuance of the war. The court say, that it was the duty of the government as far as possible to provide for "the security of persons and property and for the administration of justice so long as the war continued." The constitutionality of the court was sustained, not on the ground that the war had ceased, that peace had been restored, that civil authority and the courts had been re-established, and that the citizens of that state had ceased to be enemies of the United States and the inhabitants of the adhering states, but upon the ground that it was a military duty, to be performed by "a regular belligerent occupying during war the territory of another belligerent." The court expressly say, that "the duty of the

National government, in this respect, was no other than that which devolves upon the government of a regular belligerent occupying, during war, the territoy of another belligerent. It was a military duty to be performed by the President as commander-in-chief, and entrusted as such with the direction of the military force by which the occupation was held."

In another part of opinion it is said, " We have no doubt that the provisional court of Louisiana was properly established by the President in the exercise of his constitutional authority during war." The existence of war, of belligerent rights and constitutional authority of the President during war, are the grounds upon which the provisional court was sustained and upheld. If this be true, how can it be maintained that the war had ceased so far as New Orleans was concerned, that her inhabitants had ceased to be enemies and had been restored to the rights and privileges of citizens of the United States as they existed prior and subsequent to the war? The position is wholly untenable, and cannot be sustained either on principle or by authority.

The foregoing authorities clearly establish the following propositions. First, that the war making power is, by the constitution, vested in Congress, and that the President has no power to declare war or conclude peace, except as he may be empowered by Congress. Second, that the existence of war and the restoration of peace are to be determined by the political department of the government, and that such determination is binding and conclusive upon the courts, and deprives the courts of the power of hearing proof and determining as a question of fact either that war exists or has ceased to exist. Third, that the courts will take judicial notice of the existence of war or the restoration of peace when proclaimed by the President. Fourth, that the late rebellion did not become a civil war and was not governed by the rules of war, until the 16th of August, 1861, when the President issued his proclamation under and in pursuance of the act of Congress of July 13th, 1861. Fifth, that civil war is governed

by the same rules as a foreign war, and that the legal conse-
quences are the same. Sixth, that the proclamation of the
President placed all the inhabitants of the State of Louisiana
in a state of insurrection, made them the enemies of the Uni-
ted States and the inhabitants of the adhering states, and
rendered all commercial intercourse unlawful, except such as
might be carried on under and by virtue of a special license
and permit of the President under the rules and regulations
prescribed by the Secretary of the Treasury. Seventh, that
all contracts made during the war by belligerents, and not
licensed and permitted by the President, were absolutely
void. Eighth, that contracts made prior to the war were sus-
pended during the existence of such war; that the remedy
upon such contracts was suspended until the restoration of
peace, when the debt and the remedy revived. Ninth, that
during the existence of the war an inhabitant of a state in
rebellion had no right to institute or maintain any suit in
any court in the adhering states, and that, consequently,
the statute of limitations did not run against such person
during the existence of the war. Tenth, that the only
legal effect of the occupation of the city of New Orleans
was to authorize the President to exercise the discretionary
power vested in him by the proviso to the 5th section of act
of Congress of July 13th, 1861; that by said act of Congress
the President was authorized to license and permit limited
commercial intercourse; that such persons as had a license
and permit from the President might lawfully trade; that
such license and permit did not confer any right beyond that
of trading; that no citizen of the State of Louisiana had the
lawful right to carry on commercial intercourse without he
had a license and permit from the President issued in strict
conformity to the rules and regulations prescribed by the
Secretary of the Treasury; that such occupation did not re-
store peace or release the inhabitants thereof from the legal
consequences of their alienage and enmity, or give them a
personal standing in our courts. Eleventh, that the plaint-
iff, being an inhabitant of the State of Lousiana during the

war, was the enemy of all the inhabitants of Indiana, and consequently had no right during the existence of the war to institute and maintain an action on the contract sued on. Twelfth, that while the courts will take judicial notice that all the inhabitants of the State of Louisiana were in insurrection, they will not take judicial notice that any of such inhabitants maintained a loyal adhesion to the union and constitution, or that any part of said state was occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents, or that any particular person had a license or permit from the President to carry on commercial intercourse, but that a party relying upon such facts must allege and prove them. Thirteenth, that while actual hostilities ceased in April, 1865, peace with its legal consequences was not restored until the 20th of August, 1866, when the President issued his proclamation proclaiming that peace existed throughout the land. Fourteenth, that no part of the account sued on was created during the existence of civil war, and when commercial intercourse was unlawful. Fifteenth, that the time that intervened between the 16th, of August, 1861, and the 20th of August, 1866, is not to be included in determining whether this action is barred by the statute of limitations, and that excluding such time the action is not barred. Sixteenth, that when a statute of limitations contains no exceptions, and it appears upon the face of the complaint that the action is barred, the question can be raised by demurrer, but where there are exceptions, the statute must be pleaded, so as to give the plaintiff the opportunity of replying the facts that will bring it within the exception. Seventeenth, the conclusions that we have reached in this case render it unnecessary to examine the question of whether this action was taken out of the operation of the statute of limitations by a new promise or acknowledgment, further than to say that when the letter relied on was written, war existed, which rendered the parties enemies, and made all contracts entered into between them absolutely void.

The judgment is affirmed, with costs.

*B. E Rhoads* and *M. G. Rhoads*, for appellant.

*J. M. Allen, J. B. Cheadle, J. E. McDonald, A. L. Roache*, and *E. M. McDonald*, for appellee.