## MARKS *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 352. Argued November 12, 1895. — Decided March 2, 1896.

When a petition filed in the Court of Claims alleges that a depredation was committed by an Indian or Indians belonging to a tribe in amity with the United States, it becomes the duty of that court to inquire as to the truth of that allegation, and its truth is not determined by the mere existence of a treaty between the United States and the tribe, or by the fact that such treaty has never been formally abrogated by a declaration of war on the part of either, but the inquiry is whether, as a matter of fact, the tribe was at the time, as a tribe, in a state of actual peace with the United States : and if it appears that the depredation was committed by a single individual, or a few individuals without the consent and against the knowledge of the tribe, the court may proceed to investigate the amount of the loss, and render judgment therefor; but if, on the other hand, the tribe, as a tribe, was engaged in actual hostilities with the United States, the judgment of the Court of Claims must be that the allegation of the

petition is not sustained, and that the claim is not one within its province to adjudicate.

*Johnson* v. *United States*, 160 U. S. 546, affirmed to the point that, by clause 2 of section 1 of the act of March 3, 1891, c. 538, 26 Stat. 851, the jurisdiction of the Court of Claims was limited to claims which, on March 3, 1885, had either been examined and allowed by the Department of the Interior, or were then pending therein for examination.

On July 8, 1891, appellants, as claimants, filed their petition in the Court of Claims under the act of March 3, 1891, c. 538, 26 Stat. 851, to recover the sum of eleven thousand eight hundred dollars, the value of certain personal property charged to have been taken and destroyed by the Bannock and Piute Indians during the month of June, 1878, in Happy Valley, in the State of Oregon. Subsequently they filed an amended petition. In that it was alleged that the Bannock and the Piute Indians were "in amity with the United States" at the time of the taking and destruction of the property; that they were "chargeable for said depredation and under an obligation to pay for the same by reason of the provisions of the treaty of July 3, 1868, between the United States and the Shoshone (Eastern Band) and the Bannock tribe of Indians;" and further, that petitioners "presented their said claim to the Hon. Commissioner of Indian Affairs, No. 4915, July 27, 1888, for payment, but the same has not been returned or paid for." A traverse having been filed by the government, the case was submitted to the court, which, on February 27, 1893, made a finding of facts, and thereon entered judgment dismissing the petition. 28 C. Cl. 147. The seventh finding of fact was as follows:

"From these facts, the court finds the ultimate fact, so far as it is a question of fact, that the tribes or bands of Piute and Bannock Indians were not in amity with the United States at the time the depredations complained of were committed."

From the judgment thus entered in favor of the defendants the claimants duly appealed to this court.

*Mr. A. H. Garland* and *Mr. Charles A. Keigwin* for appellants. *Mr. William B. Matthews* and *Mr. R. C. Garland* were on their brief.

*Mr. Assistant Attorney General Howry* for appellees.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

This case, like that of *Johnson* v. *United States*, 160 U. S. 546, recently decided, involves a construction of the Indian Depredation Act of March 3, 1891. The particular language to be considered is that found in the first clause of the act, which grants to the Court of Claims jurisdiction over claims for property "destroyed by Indians belonging to any band, tribe, or nation, in amity with the United States." The seventh finding negatives the existence of amity, and if this stood alone there would be no room for discussion. But, as appears from its terms, it is based upon a series of facts stated in detail in prior findings, and is also to be taken in connection with the treaty entered into between the United States and the Bannock tribe of Indians of July 3, 1868, 15 Stat. 673, which contains, among other provisions, the following:

"If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States. And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper. But no such damages shall be adjusted and paid until thoroughly examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss while violating or because of his violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor."

Turning to the prior findings, it is stated in the second that "the Bannock and Piute Indians made a raid" in which the property in controversy was destroyed, and also that "the Indians numbered between five hundred and six hundred, and were in a body or band moving in concert, having the form of an Indian military organization." Other findings (which consist largely of telegrams and reports from various officers of the army and other officials, narrating at length a series of military operations during the years 1877 and 1878, which documents are by section 4 of the act of 1891 made competent evidence, and which are too voluminous to be copied into this opinion) show that what was done by the Indians was done by them as tribes, and not by a single individual, or a few in opposition to the will of the tribes. They show that these Indians were actually engaged in hostility, and that they were finally conquered and captured only by the military forces of the United States. Indeed, counsel for the claimants practically admit this, for in their brief it is stated "that at various times in the spring of 1878 small bands left the reservation for the sake of obtaining food, until finally the majority of the tribe were absent; that in the month of June, 1878, the absentees began killing white people, after which date the several bodies of Indians carried on a raid over a large area in Idaho and Oregon, which was finally checked by the efforts of troops of the United States; that the troops were more or less actively engaged in suppressing the outbreak until the latter part of August, 1878; and that the Indians were captured and returned to their reservation shortly after the last-named date."

Their contention is rather that actual hostilities may exist without war between two nations; that war is a political status, and to be determined by the political department of the government, by matter of record, and never by oral testimony; that it is not pretended that there was ever any formal declaration of war by either the Bannock tribe of Indians or the United States government; that, therefore, the political relations established by the treaty of 1868 continued during all these hostilities, and the tribe was "in amity with the

United States;" and further, that subject and dependent people, like the Bannock Indians, are not capable of making war with the United States. In support of this contention is cited a number of declarations of publicists and decisions of courts, such as the following from Chancellor Kent: "But, though a solemn declaration, or previous notice to the enemy, be now laid aside, it is essential that some formal public act, proceeding directly from the competent source, should announce to the people at home their new relations and duties growing out of a state of war, and which should equally apprise neutral nations of the fact, to enable them to conform their conduct to the rights belonging to the new state of things. War, says Vattel, is at present published and declared by manifestoes. Such an official act operates from its date to legalize all hostile acts, in like manner as a treaty of peace operates from its date to annul them. As war cannot lawfully be commenced on the part of the United States without an act of Congress, such an act is, of course, a formal official notice to all the world, and equivalent to the most solemn declaration." 1 Bl. Com. 55. And this from *People* v. *McLeod*, 1 Hill, 377, 407: "A state of peace and the continuance of treaties must be presumed by all the courts of justice till the contrary be shown; and this is *presumptio juris et de jure* until the national power of the country in which such courts sit officially declares the contrary."

Without questioning these declarations and decisions as applied to the relations between independent nations, we think they avail but little in the solution of the question here presented. That question is, what limitation did Congress intend by the words "in amity with the United States." The word "amity" is not a technical term. It is a word of common use; and such words when found in a statute must be given their ordinary meaning unless there be something in the context which compels a narrower or a different scope. Webster defines it "friendship, in a general sense, between individual, societies, or nations; harmony; good understanding; as, a treaty of amity and commerce." The last part of this definition shows that the phrase "in amity" is not the equivalent

of "under treaty." A "treaty" implies political relations; "amity" signifies friendship, actual peace.

The phrase "in amity with the United States" is one of frequent use in the legislation of Congress in reference to Indians. In the early act of May 19, 1796, c. 30, 1 Stat. 469, it appears twice, the sixth section reading as follows:

"That if any such citizen, or other person, shall go into any town, settlement or territory belonging to any nation or tribe of Indians, and shall there commit murder, by killing an Indian or Indians, belonging to any nation or tribe of Indians in amity with the United States, such offender, on being thereof convicted, shall suffer death."

It is found again in the act of March 3, 1799, 1 Stat. 747; that of March 30, 1802, c. 13, 2 Stat. 139, 143; June 30, 1834, c. 160, 4 Stat. 728, 731, and elsewhere; appearing in the statutes, as stated by counsel, some fifty or sixty times.

The frequent use of this phrase in connection with the same subject-matter during all the legislative history of this country suggests, of course, a single and settled meaning. And, as said by Nott, J., in *Love* v. *United States*, 29 C. Cl. 332, 340: "What did it mean, in 1796, when the law declared it to be murder to kill an Indian of a tribe ' in amity with the United States?'" If that particular section had been in force during these hostilities it would not seriously be contended that the killing of a hostile Bannock by one of the soldiers of our army, even if done within the limits of the Bannock reservation, would have been murder, on the ground that the Bannock tribe was still under treaty relations, and, therefore, in amity with the government.

Further, there are obvious reasons why Congress did not use this phrase in any different sense than as theretofore used. At the time of the passage of the act, nearly every tribe and band of Indians within the territorial limits of the United States was under some treaty relations with the government. It is said by counsel that there appear in the statutes, prior to the act of March 3, 1871, c. 120, 16 Stat. 544, 566, declaring against further treaties, 666 treaties with Indian tribes. And it is a matter of history that all along our western frontier

there has been a succession of Indian wars, with great destruction of life and property, and yet seldom has there been a formal declaration of war on the part of either the government or the Indians. If the contention of the claimants were sustained, it would be practically tantamount to holding that by this language Congress had for the government assumed responsibility for all depredations committed by Indians domiciled within the territorial limits of the United States, subsequently at least to the year 1865, and given to the Court of Claims jurisdiction to determine and finally adjudicate the amount thereof.

If such had been its intent, it seems as though it would have expressed itself in different language, and not by a phrase so suggestive, from past use, of a more limited purpose.

Again, as often affirmed in the decisions of this court, the Indians are, in a certain sense, the wards of the United States, and the legislation of Congress is to be interpreted as intended for their benefit. The act of 1891 contemplates that in the same suit the tribe by whom, or members of whom, the depredation is charged to have been committed, may be made a party defendant. In section 5 it is provided that the court, after determining the value of the property, "shall render judgment in favor of the claimant or claimants against the United States, and against the tribe of Indians committing the wrong, when such can be identified." Section 6 reads as follows :

" The amount of any judgment so rendered against any tribe of Indians shall be charged against the tribe by which, or by members of which, the court shall find that the depredation was committed, and shall be deducted and paid in the following manner : First, from annuities due said tribe from the United States; second, if no annuities are due or available, then from any other funds due said tribe from the United States, arising from the sale of their lands or otherwise; third, if no such funds are due or available, then from any appropriation for the benefit of said tribe other than appropriations for their current and necessary support, subsistence and education ; and, fourth, if no such annuity, fund or appro-

priation is due or available, then the amount of the judgment shall be paid from the Treasury of the United States: *Provided*, That any amount so paid from the Treasury of the United States shall remain a charge against such tribe, and shall be deducted from any annuity, fund or appropriation hereinbefore designated which may hereafter become due from the United States to such tribe."

If this act requires the construction claimed, it is obvious to any one familiar with the history of the Indian, and even independently of what is said by counsel to be the record as to the multitude and amount of the claims presented, that the outcome would be, as to most if not of all of these tribes, that every dollar of annuity, if not every dollar of fund, would be swept away in satisfaction of these claims. We do not think this legislation is to be thus construed, and are of the opinion that all that Congress intended was that when, as a matter of fact, a tribe was in the relation of actual peace with the United States, and by some individual, or individuals, without the consent or approval of the tribe, a depredation was committed upon the property of citizens of the United States, such depredation might be investigated, and the amount of the loss determined and adjudicated by the Court of Claims. This is in harmony with the language of many of the treaties between the United States and the Indians, and, among others, that of the treaty between the United States and the Bannock tribe, heretofore quoted, which reads : " If bad men among the Indians shall commit a wrong or depredation," etc.

In the light of this conclusion, it may be said that when the petition filed in the Court of Claims alleges that a depredation was committed by an Indian or Indians belonging to a tribe in amity with the United States, it becomes the duty of that court to inquire as to the truth of that allegation, and its truth is not determined by the mere existence of a treaty between the United States and the tribe, or the fact that such treaty has never been formally abrogated by a declaration of war on the part of either, but that the inquiry is, whether as a matter of fact, the tribe was at the time, as a tribe, in a state of actual peace with the United States. If so, and the

depredation was committed by a single individual, or a few individuals without the consent and against the knowledge of the tribe, the court may proceed to investigate the amount of the loss, and render judgment therefor. If, on the other hand, the tribe, as a tribe, was engaged in actual hostilities with the United States, the judgment of the Court of Claims must be that the allegation of the petition is not sustained, and that the claim is not one within its province to adjudicate. It is doubtless true that the existence of a treaty implies a state of peace, and, if no other evidence were produced, the court might properly infer therefrom that the tribe was in amity with the United States; but, after all, it is a question of fact, to be determined by the testimony which may be introduced. That question was investigated by the Court of Claims in this case, and its conclusion, justified by the facts as shown by the various reports and documents in evidence, was undoubtedly correct. The Bannock tribe was not, at the time of these depredations, in amity with the United States, and, therefore, the Court of Claims properly refused to adjudicate upon the amount of the loss, or render judgment therefor against the United States.

Neither does this case come within the second jurisdictional clause of the act of 1891, for this was not a claim which had been examined and allowed by the Interior Department, or one which, on March 3, 1885, had been filed and was pending in said department for examination. *Johnson* v. *United States,* 160 U. S. 546. The conclusion reached in that case in reference to the scope of this second clause has been challenged, and it has been said that such second clause should be construed in connection with this language in section 2: "No claim shall be excluded from the jurisdiction of the court because not heretofore presented to the Secretary of the Interior, or other officer or department of the government;" and that, so construed, neither the time nor the fact of filing in the Interior Department is material. No such construction can be sustained. It would in effect make the statute read as granting jurisdiction over all cases which, on March 3, 1885, had been examined and allowed by the Interior Department, and

over all then filed in that department but not yet examined and allowed, with a proviso that it is immaterial whether the claim was ever filed in the department. The antagonism between the grant and the proviso is fatal to such a construction. The act of March 3, 1885, defines claims not by their nature but by their status as filed and allowed or simply filed. And to say that filing is immaterial when filing is the descriptive matter is to destroy the significance of the clause. Full scope can be given for the operation of these words in section 2 by connecting them with the first jurisdictional clause, which is a general grant of jurisdiction over all claims for property of citizens taken or destroyed by Indians in amity with the United States.

These are the only matters requiring consideration, and no error appearing in the conclusions reached by the Court of Claims, its judgment is

*Affirmed.*