Weldon, J.,
delivered the opinion of the court:
On August 15, 1891, the claimant filed a petition in which it is alleged that on or about the 22d day of September, 1866, the said defendant Indians, in the county of Mohave, in the Territory of Arizona, committed a depredation in which they ‘ ‘ destroyed or carried away a great quantity of the property of your petitioner,” amounting in the aggregate to the sum of more than $4,000, consisting of horses, mules, harness, household furniture, jeweliy, provisions, library, money, etc. It is also alleged that at the same time and place the said defendant Indians took and carried away an agreement signed b}r certain parties in which they obligated themselves to pay the petitioner the sum of $18,000, and that in consequence of such wrong the petitioner has been unable to collect the money due on such obligation.
It is further alleged in the petition that in August or September, 1867, the defendant Indians'made another raid in which a large amount of personal property was destroyed and stolen, consisting of horses, mules, money, checks, due bills, notes, bonds, etc., amounting to the sum of $119,363, the entire loss aggregating the sum of $141,046.
It is alleged as to the first depredation that, on account of the uneasiness because of the presence of the Indians in the neighborhood of the place of the first raid, the petitioner was compelled to remove to a place of safety about 300 miles dis *20 tant, and that during his absence the Indians ravaged the neighborhood and killed several men, including an employee of the petitioner.
It is alleged as to the circumstances of the second depredation that the Indians attacked and killed four men who were at the camp of the petitioner, three of whom were in his employ, and that the petitioner was “shot off his horse, but succeeded in escaping with his life.”
The defendants contest the plaintiff’s alleged right of recovery, first, upon the ground that at the time of the alleged depredations the Indians were not in amity with the United States; and, second, upon the further ground that the evidence of ownership and taking is not sufficient to warrant a judgment for the plaintiff.
The first issue raised by the contention of the defendants jxresents a mixed question of law and fact, and if found for the defendants, going as it does to the jurisdiction of the court, disposes of the case, and it is wholly immaterial whether or not the claimant suffered as alleged.
The allegations of the petition describing the character and circumstances of the different raids are indicative of a very cruel, wanton, and hostile spirit on the part of the Indians, and bring into grave doubt the fundamental condition upon which the law bases the plaintiff’s right to recover, to wit, the amity of the Indians. If the Indians at the time of the raid were actuated by the sole purpose of theft and pillage, it is not probable that thejr would have indulged in the cruelty and crime of killing the persons in charge, of the property.
The findings show that the petitioner had established a mining camp in both instances, and had surrounded himself with the character of property usually attached to a camp for mining purposes, but whether the property alleged to have been taken or destroyed belonged to him individually or to a corporation is not definitely and satisfactorily shown by the evidence.
The question of the amity" of the Indians at the time of the alleged depredations being raised by the brief of the defendant, and being, without such contention, always incident to the inquiry and investigation of the court, it must be consid *21 ered and determined as a preliminary' issue, and if found adversely to the plaintiff the'petition must be dismissed.
The petition alleges the loss in 1868 on the 22d day of September and the loss in 1867 as in August or September of that year. The findings show the circumstances of the alleged depredations. The camp and camping property was destroyed by being burned, and the persons in charge who were not killed were driven away; that in consequence of the excitement and alarm because of the raids mining operations were subtantially abandoned during the years 1866 and 1867; that many persons were killed during the period, and that the military authorities nearest the scene of the. depredations detailed soldiers to bury the persons killed in the last massacre.
The claimant was compelled, because'of the hostility of the Indians, to send his wife to California, .a distance of 300 miles, and was compelled to have an escort for some distance after leaving the vicinity of the depredations.
In connection with those facts determined from and by the testimony of the witnesses sworn in the cause, the court has had recourse to certain public documents appearing in the findings (for convenience) from which to determine the ultimate fact as to whether the Indians at the time of the alleged depredations to the property of claimant were in a condition of amity with the United States. It is shown by the finding that in consequence of the raids of the Indians the excitement and alarm were such that mining operations were suspended during the year 1866 and down to the year 1871, and that soldiers were sent to the scene of the raids to operate against the Indians and .to bury the bodies of those killed and massacred during the troubles.
The allegations of the petition indicate a degree of violence and hostility on the part of the Indians incompatible with the spirit of amity and contradictory to the theory that the attacks were for the purpose of theft and plunder. Four men were killed in the last raid, three of whom were in the employ of the claimant, and he was “shot off his horse, but succeeded in escaping with his life.”
The condition of the defendant Indians during the years *22 1866 and 1867 is indicated in the public documents set forth in the findings.
In the report of the Secretary of the Interior, first session Thirty-ninth Congress, 1865-66, on page 296, is found the report of John C. Dunn, Indian agent at Prescott, Ariz. This agent states:
“* * * The condition of affairs stated as probable to ensue, in my letter referred to above, now exists. We have war waged upon us by the Yavapais, the Hualapais, and the Apache-Mohaves, which has been brought on by the wanton and cruel aggressions of not only the settlers but by the troops placed here for protection and peace.”
The report of the Commissioner of Indian Affairs for the year 1866, on page 108, contains the report of the superintendent for Arizona, in which it is stated:
“ * * * But i^tle has been done by the military toward subduing the hostile Apaches. Report says some 100 of these Indians have lately visited Fort Goodwin, anxious to make peace, and, no doubt, feed on Government beef, which at that place must be very dear. The Indians in the vicinity of Prescott are robbing, stealing, and murdering. One soldier and two citizens were killed a short distance from the capital, on the road to Wickensburg, during my visit. The Indians committing these depredations are renegades from the Hualapais and Yavapais or Apache-Mohaves. A few days after my departure from Prescott they ran off 17 head of horses from Skull Yalley, about 18 miles from Prescott, on the road to this place.”
On page 109 of same report, the bands of Apaches in New Mexico are classified and located as follows:
“The Indians of this Territory may, for all practical purposes, be fairly divided into two distinct sections or societies by an imaginary line, beginning at the southern boundary of Arizona, where the one hundred and eleventh degree of longitude intersects the same; thence due north to the Gila River; thence by Pima .Reservation down the Gila to the one hundred and thirteenth degree of longitude; thence due noi'th to the boundary of Utah.
“First. All the territory east of this line, excepting that of the Moqui Pueblos, is occupied by roving and robbing Indians, by the various tribes of the Apaches, and a few unsubdued Navajos under Miquilito, north of the Little Colorado. These, like the Bedouins of the desert, are the terror of the surrounding Indians, and the unceasing, implacable *23 enemj7 of civilization. Cruel, cowardly, and few in numbers, they have nevertheless successfully defied the advance of Spanish and Mexican power and civilization for centuries and that of the United States since the acquisition of the Territory. Their very insignificant number, scattered over a vast, mountainous country, has to them proved to be strength.
“Second. The section west of this line is occupied by tribes either kindred in origin or at least affiliated by intermarriage, frequent intercourse, barter, and similar agricultural pursuits/ Of common (supposed Aztec) origin are the Pimos, Papagoes, Moquis, Mojar is, and Yumas. Affiliated with them are the Maricopas, Hualapais, and Yurapeis. . Of the Yurapeis but little is known as yet; they seem to be few in numbers, and vegetate in the deep and dismal but sublime canyons and chasms of the Upper Colorado.
“The Yumas and Mohaves inhabit the immediate margin of the middle Colorado, from 32° 30' to 35° 30' north latitude.”
The Commissioner of Indian Affairs, for 1867, page 10, makes report of the Arizona superintendency as follows:
“Reports represent the relations with the hostile tribes of this superintendency as unchanged. What the military have accomplished toward producing a better, state of things is not apparent. In some instances their scouting parties may have been successful, still there is no general peace; depredations and murders by the Indians are yet committed. The trouble is mainly with the large and warlike tribe of Apaches, but these recently have indicated a desire to be friendly, to cease their depredations, and be restricted to a country of defined limits. Some of their bands entered into a treaty last summer with an officer of the Army in command at Fort Grant,1 but the arrangement, being unauthorized, has been disavowed. «- * • * * * * *
‘4 The Hualapais are also hostile. An attempt to bring them into a peaceful condition failed in consequence of the killing of one of their most influential chiefs by, whites. The Yava-pais, too, have been troublesome and outrageous. All the other tribes are well disposed and making considerable progress in civilization.”
The report of the Secretary of the interior for 1868, page 596, etc., deals with the question of the amity of the defendant Indians, and, commencing on page 599, will be found a report of Capt. Charles A. Whittier, in which is stated:
“* * * Colonel Price seemed satisfied that the Indians had left that reservation and were engaged in hostilities in company with the Hualapais. One letter from Mr. *24 Dent, superintendent, seen by me (the letter), stated that 75 or 80 bad left. Another letter said that none had. The Indians which came to McDowell while I was there, and who were fired upon as I’have reported, showed strong marks of being from this reservation; but all accounts seem to agree that little is done at the reservation by the Government toward satisfying the wants and caring properly for the large number of Indians who, from the location of this reservation, are properly subject to its bounty. * * *
“On the north and south of the road from Camp Mohave to Prescott are the Rualapais. Two years ago, when I went through that country, I found them friendly; talked with the chief, and travel was safe through that section. Now they are in a state of hostility, induced by the killing of their chief, Wauba Luma, by the whites, and have made the road ~ an unsafe one for small parties. They are estimated in number at 150. The Yavapais are about Prescott, are hostile, not of large numbers, and may to some extent engage in depredations in company with the Hualapais, and are supposed to have ranchei’ias between Camp McPherson and Prescott. In the past many outrages have been committed in Skull Valley and Bells Canyon (between Skull Valley and Camp McPherson). It is doubtful whether the Yavapai or the Apache has been the more prominent in these.
“The numbers, particular haunts, and natures of the hostile tribes are involved in much doubt. With no tribe is this more the case than with the Apaches, and although we find officers and citizens who speak in great confidence of their knowledge of this tribe and that tribe of the Apaches, when their statements are sifted down we often find them mere speculation.”
It is not shown that the Indians had any encounter with the United States soldiers at the place of the alleged depredations, but the circumstances of their condition and their suspended relations with the United States authorities indicate a state of feeling hostile and warlike.
It may have been that the Indians had just cause for their hostility, but that does not change the fact of hostility. Want of amity, for any cause, bars the jurisdiction of the court and the claimant’s right to recover. Leighton v. The United States (161 U. S. R., 291); Leighton v. The United States (29 C. Cls. R., 288). It seems to have been the opinion of the Indian agent that the Indians had been provoked to their condition by the aggressions of the settlers and misconduct of the troops. If that is true, it would be adding injury to injury to *25 bold that, notwithstanding their just indignation and hostility, they are responsible in damages, and not protected by that provision of the act of 1891 which exempts them from liability when not in amity.
The circumstances and facts of the alleged depredations and the condition of the Indians during the years 1866 and 1867, as indicated by the public documents, are as to their legal effect and consequence on the rights of the parties aptly construed by the Supreme Court in the case of Marks v. The United States (161 U. S. R., 303). In that case the court said in reply to many decisions and authorities cited on the question of war:
“Without questioning these declarations and decisions as applied to the relations between independent nations, we think they avail but little in the solution of the question here presented . That question is, What limitation did Congress intend by the words ‘in amity with the United States?’ The word ‘ amity’ is not a technical term. It is a word of common use; and such words when found in a statute must be given their ordinary meaning unless there be something in the context which compels a narrower or a different scope. Webster defines it ‘ friendship, in a general sense, between individuals, societies, or nations; harmony; good understanding; as, a treaty of amity and commerce.’ The last part of this definition shows that the phrase ‘ in amity'.’ is not the equivalent of ‘ under treaty. ’ A ‘ treaty ’ implies political relations; ‘ amity ’ signifies friendship, actual peace.”
In the Marks Case {supra) it is, in substance, said by this court that in the construction of a statute words are to be taken in their ordinary and common acceptation unless such a construction would do manifest injustice to the intent and purpose of the legislature; that the word “amity” is not technical in its character, is not peculiar to a circumscribed subject-matter, and must be construed in its broad and ordinary signification, and that taken in its ordinary and common signification it indicates a state of peace and good-fellowship. Marks et al. v. The United States (28 C. Cls. R., 168). For these reasons the petition is dismissed for want of amity, as shown in the conclusion of law.