**WESTERN RESERVE LIFE INS. CO. v.
MEADOWS.**

No. 15413.

Court of Civil Appeals of Texas.
Fort Worth.

March 6, 1953.

Rehearing Denied April 3, 1953.

J. W. Wheeler, of Austin, for appellant.

Alexander & Martin, of Fort Worth, for appellee.

BOYD, Justice.

Suit by Jennie Louise Davidson Meadows, the beneficiary in five policies of life insurance issued October 6, 1932, by Western Reserve Life Insurance Company, to recover the sum of $1,000 accidental death benefits on each policy. Western Reserve Life Insurance Company admitted liability for the face amount of the policies involved but denied liability for double indemnity benefits. The accidental death benefit rider, which is the subject matter of this suit, appearing in each policy, contains the following provisions: "This Accidental Death Benefit shall be void if the Insured shall be in military, naval, or allied service in time of war at the date of the accident, * * *; nor does it cover death resulting directly or indirectly from any of the following, to-wit: Participation in aeronautics; * * *."

The parties entered into the following stipulations:

1. "That Benjamin Earle Meadows' death resulted from bodily injuries caused directly, exclusively and independently of all other causes, by external, violent and accidental means, to-wit: by the crash of a Military Plane on which he was a passenger and traveling under military orders from Fort Richardson, Territory of Alaska, to Fairbanks, Territory of Alaska, for the purpose of opening bids on Army Air Field Construction in Fairbanks."

2. "That at the time of his death on August 23, 1951, Benjamin Earle Meadows was a Lieutenant Colonel in the Army Engineers Corps of the United States Army and was in military service on the 23rd day of August, 1951, and at the time of his death."

3. "That Benjamin Earle Meadows' death occurred instantly on the 23rd day of August, 1951, when a United States Army plane on which he was traveling as a passenger under official orders, 'said orders being issued by authorized United States Army Personnel,' crashed and burned on a runway at Summit, Territory of Alaska, after said plane had lost a wing."

4. "* * * That part of the duties of said Benjamin Earle Meadows at and for several months prior to his death was the supervision of the construction of United States Air Fields and other Army installations in the Territory of Alaska, and he was in the performance of such duties at the time of his death."

5. "That in the performance of his said duties, said Benjamin Earle Meadows was required to and did fly in United States Army planes under official orders issued by proper authorities from one Army Air Field to another in the Territory of Alaska for the purpose of supervising, aiding and advising with reference to the construction of and improvement of United States Army Air Fields as well as other Army installations."

It was further stipulated: (a) that through midnight, September 7, 1951, the United States forces had suffered 82,362 casualties in Korea, as shown by release of the Department of Defense, Office of Public Information, for which notification of next of kin had been made; and (b) that by letter dated June 6, 1942, the appellant advised the insured, who was then in military service, that the extra accidental bene-

fit provisions did not apply so long as he was in the armed services in time of war, and that this provision would be removed upon request. He made the request, and the provision was removed. On April 6, 1946, at insured's request, this provision was restored.

Western Reserve Life Insurance Company answered in the trial court pleading that it admitted liability for the face amount of such policies but denying liability for the accidental death benefits, specifically pleading the exclusions contained in the policies and the accidental death benefit riders, and that at the time of the accident which resulted in the death of Benjamin Earle Meadows the insured was in military service in time of war and that his death resulted directly or indirectly from participation in aeronautics.

Trial was before the court without a jury and the court rendered judgment in favor of plaintiff for $5,000 together with 12% statutory damages, interest, and $1,500 attorneys' fees.

The trial court held that Col. Meadows' death did not result directly or indirectly from participation in aeronautics, and that it did not occur while he was in military service in time of war. The appeal brings such holdings before this court for review.

Five points of error are presented by the appellant, but they involve only two propositions, namely: that the trial court erred in not finding that the insured's death resulted directly or indirectly from participation in aeronautics, and in not finding that it occurred while he was in military service in time of war, under the exclusion clauses of the policies.

■ "Undoubtedly the parties to an insurance contract may make it in any legal form they desire and, in the absence of statutory prohibitions, insurers may limit their liability and impose whatever conditions they please upon their obligations not inconsistent with public policy. That the conditions may be harsh does not affect the rule, as no one is compelled to deal with the insurers on basis of such conditions." Hatch v. Turner, 145 Tex. 17, 193 S.W.2d 668, 669.

■ The rule of construction of contracts is to ascertain the intention of the parties from the contract itself. The terms, unless ambiguous, will establish the rights of the parties. Citizens National Bank in Abilene v. Texas & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003. It is settled law that when the terms of an insurance policy are ambiguous and susceptible of more than one construction they should be interpreted strictly against the insurer and liberally in favor of the insured. 24 Tex.Jur., p. 705. The validity of a provision of an insurance policy limiting liability because of the connection of the insured with military forces is almost universally recognized. Sovereign Camp W. O. W. v. Jackson, Tex.Civ.App., 264 S.W. 289; 137 A.L.R. 1263.

There are many cases involving insurance policy exclusion clauses relating to participation in aeronautics the same as, or very similar to, the one before us, with the same or similar fact situations, and there is, or was, some lack of uniformity in the holdings of the courts.

In 1921, in Bew v. Travelers Insurance Co., 95 N.J.L. 533, 112 A. 859, 14 A.L.R. 983, the New Jersey Court of Errors and Appeals held that in the accidental death of a fare-paying airplane passenger, recovery was precluded by a clause in the policy as follows: "nor shall it cover injuries * * * sustained by the insured while participating in or in consequence of having participated in aeronautics." It may be well to note, however, that in the Bew case the insured, a passenger, lost his life in the crash of an airplane which was being used by its owner to carry passengers "at so much a trip, just to see Atlantic City, and for the novelty of the thing."

Also, in 1921, in Travelers Insurance Co. v. Peake, 82 Fla. 128, 89 So. 418, the Supreme Court of Florida, on the sole authority of the Bew case, held that a passenger in an airplane "flying in the air, whether he takes part in the operation of the airplane or not, is 'participating in aeronautics'". The insured in the Peake case was attending the Alabama State Fair and was injured while taking a short trip for hire in

an airplane operated for that purpose at the fair grounds.

The Bew and Peake cases were followed by the courts in some other jurisdictions, notably in Meredith v. Business Men's Accident Association, 1923, 213 Mo.App. 688, 252 S.W. 976

But courts in many jurisdictions have held that where accidental death occurred while the insured was an airplane passenger the beneficiaries could recover under exclusion clauses prohibiting recovery if death occurred while the insured was "participating in aeronautics," and this holding seems to be supported by reason and the weight of authority.

In Marks v. Mutual Life Ins. Co. of New York, 9 Cir., 96 F.2d 267, the court said that "The time for reconsideration of earlier views had already arrived (1928) when the policy was issued."

In the following cases, Mutual Benefit Health & Accident Ass'n v. Bowman, 8 Cir., 99 F.2d 856, and Mutual Benefit Health & Accident Ass'n v. Moyer, 9 Cir., 94 F.2d 906, 907, recovery was allowed for death of a passenger resulting from a plane crash when the exclusion clause excepted liability if death occurred " 'because of or while participating in aeronautics.' "

In Martin v. Mutual Life Ins. Co., 189 Ark. 291, 71 S.W.2d 694; Gregory v. Mutual Life Ins. Co. of New York, 8 Cir., 78 F. 2d 522, writ denied; Massachusetts Protective Ass'n. Inc. v. Bayersdorfer, 6 Cir., 105 F.2d 595; Swasey v. Massachusetts Protective Ass'n, Inc., 9 Cir., 96 F.2d 265; Chappell v. Commercial Cas. Ins. Co., 120 W.Va. 262, 197 S.E. 723; and Marks v. Mutual Life Ins. Co. of New York, supra, recovery was allowed for the death of an airplane passenger when the exclusion clause read: "if death resulted from * * * participation in aeronautics."

In Martin v. Mutual Life Ins. Co. of New York, supra [189 Ark. 291, 71 S.W.2d 695], the Supreme Court of Arkansas held that a provision in a policy excepting insurer from liability for death resulting from " 'participation in aeronautics' " did not prevent recovery where insured was killed in a crash of an airplane in which he was riding as an invited guest.

In 1935, in Gregory v. Mutual Life Ins. Co. of New York, supra [78 F.2d 523], the court said: " * * * one who rides the plane for the sole purpose of going some place, of being transported by it as a passenger, is not, we think, in the absence of specific words requiring such construction, participating in aeronautics. He does not belong to the same craft or class as those skilled artisans who participate in the construction, management, or operation of the airplane.

"In this field there have been revolutionary developments, particularly in the last ten or fifteen years. When the terms 'engaging in aeronautics,' and 'participating in aeronautics,' were first introduced into insurance contracts, the science or art was in its experimental stage. Any person who then had to do with the airplane was participating in aeronautics. The acrobat who staged a balloon ascension at a country fair, and thrilled the onlookers by dropping from a balloon in a parachute, was participating in aeronautics. When Colonel Lindbergh made his perilous solo flight across the Atlantic, he was participating in aeronautics. In the earlier stages of the development of the science or art, everyone connected with it was participating in a dangerous experiment or adventure, and there was no place about the instrumentalities for any one who was not participating in the venture. But in the last ten or fifteen years, these implements of the air have been developed from the stage of the dangerous experiment to a well-recognized standard means of passenger transportation. Now, one may know nothing of the science or art, have no interest in the mechanism, and no control over it, but may yet utilize it as a means of transportation. The terms must be considered in the light of these known revolutionary changes and development in the art."

In Sun Life Assur. Co. of Canada v. Kiester, 83 Ga.App. 87, 62 S.E.2d 660; Phoenix Mut. Life Ins. Co. of Hartford, Conn. v. Flynn, 83 U.S.App.D.C. 381, 171 F.2d 982; and Funk v. New York Life Ins. Co., 186 Misc. 449, 60 N.Y.S.2d 349, recovery was allowed for the death of a passenger notwithstanding that the exclusion

clauses provided for no liability if insured was "participating in aeronautics *as a passenger or otherwise."*

Before the holdings that a passenger on an airplane was not "participating in aeronautics" became so nearly unanimous as they now appear to be, it was generally held that a passenger did not "engage" in aeronautics, and some courts attempt to draw a distinction between "engage" and "participate," saying that the word "engaged" had an occupational connotation, while "participated" did not.

In Sun Life Assur. Co. of Canada v. Kiester, supra [83 Ga.App. 87, 62 S.E.2d 662], the court said: "Courts generally, however, while holding that the word 'engage' had an occupational connotation, at first pressed a technical distinction as to the word 'participate', and generally denied recovery under policies containing the words 'participating as a passenger or otherwise in aeronautic activity', 'participating as a passenger or otherwise in aeronautic expeditions' and 'participating as a passenger or otherwise in aeronautic operations', following the earlier distinction that 'participation' might refer to a single transaction or flight, whereas 'engaging' did not do so. * * *

"More recent cases, however, have tended to abandon this technical distinction between the words 'engage' and 'participation', and also a like distinction between the words 'aviation' and 'aeronautics'. In Martin v. Mutual Life Ins. Co., 189 Ark. 291, 71 S.W.2d 694, 695, the court held that the words 'participation in aviation or aeronautics' does not cover a mere passenger, stating: 'The distinction thought by the courts to exist between "engage in aeronautics" and "participation in aviation" may be apparent to, and approved by, those learned in the niceties of the language and accustomed to its precise use, but it is to be doubted whether these hairsplitting and subtle distinctions would occur to, or be understood by, the majority of the thousands of persons who seek insurance against the many hazards to life and limb * * *.' "

After carefully considering the authorities, we are of the opinion that a passenger on an airplane is not "participating in aeronautics" as those words are used in an insurance policy exclusion clause excepting liability for loss "resulting directly or indirectly from participation in aeronautics," and that under the facts stipulated the trial court did not err in holding that such clause in the policies under consideration was not a bar to recovery by the appellee.

Appellant cites Aetna Life Ins. Co. v. Reed, 251 S.W.2d 150, as an authority from the Supreme Court of Texas for the proposition that a passenger in a plane "participates in aeronautics." We do not think the decision in that case is in opposition to the conclusion here expressed. The exclusion clause in Mr. Reed's policy provided that double indemnity would not be payable if death occurred as a result of an "aeronautic flight." It was necessary for Mr. Reed and two business associates to go from Dallas, Texas, to Washington, D. C., on the same matter of business, and one of the associates procured a plane from a partner in another business in which the insured owned no interest. This associate was a licensed pilot and was piloting the plane on the flight to Washington when it fell to the ground, killing all the occupants. The Supreme Court held that Mr. Reed's death resulted from "an aeronautic flight." That was the only question before the Court, and the only question determined.

Appellant's other proposition, namely, that the trial court erred in not finding that the insured's death on August 23, 1951, occurred while he was in military service "in time of war," presents a more difficult question. Specifically, we are called upon to determine whether by reason of the conflict in Korea, August 23, 1951, was "a time of war" in the meaning of the exclusion clause in Col. Meadows' policies.

This court must take judicial knowledge of the political history of the world, and we cannot profess ignorance of momentous events taking place on this continent and in other quarters of the globe. World-shaking upheavals, political or military, evidence of which is as near as our newspapers, telephones, radios, and television sets, are things we are bound "to

notice and to know." We are not insensible to the sanguinary nature of this conflict and are painfully aware of the 128,000 casualties already sustained by the United States forces in the theater of hostilities, and we know something of the treasure expended and other sacrifices endured by our people since the invasion of South Korea began. While these observations properly belong to the case, it is nevertheless the duty of a court to ascertain and apply the law to controversies coming before it, uninfluenced by the emotional factors which are inseparable from any contemplation of the existence of a struggle that so profoundly affects us all.

■ Among the powers granted by the people to the Federal government is the power to declare war, and it was granted to the legislative department exclusively.

In Bishop v. Jones and Petty, 28 Tex. 294, the court said: " * * * there can be no war by its government, of which the court can take judicial knowledge, until there has been some act or declaration creating or recognizing its existence by that department of the government clothed with the war-making power."

The existence of war "is determined by the authorized political department of the government. So, lawful war can never exist without the actual concurrence of the war-making power, but may exist prior to any contest of the armed forces. The courts are bound by a declaration or determination by the proper department of the government that a war exists, while until there has been such a declaration or determination the courts cannot take judicial notice of the existence of a war by their government." 67 C.J., p. 336.

In People v. McLeod, 25 Wend., N.Y., 483, 37 Am.Dec. 328, it is said that lawful war "can never exist without the actual concurrence of the war-making power. This, on the part of the United States, is Congress; * * *. In Blackburne v. Thompson, 15 East, 81, 90, Lord Ellenborough, C. J., * * * said: 'I agree with the master of the rolls, * * * that it belongs to the government of the country to determine in what relation of peace or war any other country stands toward it;

and that it would be unsafe for courts of justice to take upon them, without that authority, to decide upon those relations.' "

In Perkins v. Rogers, 35 Ind. 124, 9 Am. Rep. 639, in commenting on the decision in the Prize cases, The Amy Warwick, 2 Black 635, 17 L.Ed. 459, which is relied upon by appellant, and which held that so far as the right of neutrals to engage in commerce with the seceding states was concerned, the war between the states existed after the beginning of hostilities and before the Presidential proclamation of August 16, 1861, pursuant to an act of Congress of July 13, 1861, 12 Stat. 255, was made, the court had this to say: "The minority of the court were of the opinion, that by the constitution, congress alone had the power to declare war, and that consequently the late rebellion did not become a civil war until it was made such by proclamation of the president, on the 16th day of August, 1861, and which was under and by virtue of the power that was conferred on him by the act of Congress, July 13, 1861. The decision pronounced by the majority of the court has been overruled by several decisions rendered, and the opinion expressed by the minority of the court has since been approved and recognized as the law. * * * (Citing Dean v. Nelson, 10 Wall. 158 [19 L.Ed. 926]; Chappelle v. Olney, [Fed.Cas. No. 2,613] U.S.Cir.Ct., Dist. of Oregon, Dec. term, 1870, published in American Law Times) * * * We are clearly of the opinion, from the above decisions, and our understanding and construction of the constitution of the United States, that the late rebellion did not become a civil war until it was made such by the proclamation of the president, on the 16th of August, 1861, made in pursuance of the act of Congress of the 13th of July, 1861, * * *."

But the opinion of the majority in the Prize cases, The Amy Warwick, 2 Black 635, 17 L.Ed. 459, used the following interesting language: "By the Constitution, Congress alone has the power to declare a national or foreign war. It cannot declare war against a State or any number of States, by virtue of any clause in the Constitution. The Constitution confers on the

President the whole executive power. * * He has no power to initiate or declare a war either against a foreign nation or a domestic State. .* * * If a war be made by invasion of, a foreign nation, the President is not only authorized but bound to resist force, by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority. And whether the hostile party be a foreign invader, or States organized in rebellion, it is none the less a war, although the declaration of it be 'unilateral.'" The Prize Cases (The Amy Warwick) 2 Black 635, 17 L.Ed. 459.

In Marks v. U. S., 161 U.S. 297, 16 S.Ct. 476, 478, 40 L.Ed. 706, the court quotes Chancellor Kent as follows: "'* * * it is essential that some formal public act, proceeding directly from the competent source, should announce to the people at home their new relations and duties growing out of a state of war, * * *. As war cannot lawfully be commenced on the part of the United States without an act of congress, such an act is, of course, a formal official notice to all the world, and equivalent to the most solemn declaration.'"

Several cases arose in different jurisdictions involving similar exclusion clauses in contracts insuring members of our armed forces who lost their lives in the Pearl Harbor attack December 7, 1941. In a majority of such cases recovery was permitted on the ground that a state of war did not exist between this country and Japan until Congress declared war the next day, Joint Resolution Dec. 8, 1941, 50 U.S. C.A.Appendix, note preceding section 1. West v. Palmetto State Life Ins. Co., 202 S.C. 422, 25 S.E.2d 475, 145 A.L.R. 1461; Rosenau v. Idaho Mut. Ben. Ass'n, 65 Idaho 408, 145 P.2d 227; Savage v. Sun Life Assur. Co. of Canada, D.C., 57 F.Supp. 620, 621; and Pang v. Sun Life Assur. Co., 37 Hawaii 208. In the Savage case the court said that the term "war" must be interpreted in a more definite sense than to "depend upon the violence or inconsequential nature of the acts of the attacker. If a state of war is to be judged by the latter circumstances, it would exist or not according to the opinion of the particular court construing it. On the other hand, if it is held to mean a condition accepted or recognized by the political authority of the government which is attacked, whether through an actual declaration of war or other acts clearly demonstrating such position, then we would have a criterion which could be readily understood and applied to cases, no matter what the circumstances might be." Opposed to the holdings in those cases is the decision, cited by appellant, in New York Life Ins. Co. v. Bennion, 10 Cir., 158 F.2d 260, 261, (writ denied). Capt. Bennion lost his life in the Pearl Harbor attack, and the court denied recovery under an exclusion clause excepting liability for death resulting from "war or any act incident thereto." In the Bennion case the court said that 250 or 300 Japanese planes damaged or destroyed 8 battleships, nine other vessels, and land-based installations, and inflicted 3,435 casualties upon our servicemen, and that "[it] was one of the greatest military and naval disasters in our nation's history. * * * When one sovereign nation attacks another with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, we have war in the grim sense of reality." The court also said that about an hour after the attack began the Japanese envoys delivered a note to our State Department severing diplomatic relations, which act was intended to coincide with the attack, and that while the attack was in progress the Japanese Imperial Headquarters announced that war began at dawn that date, "meaning 7:30 a. m. Honolulu time", and eight hours later the Japanese Foreign Minister notified the American Embassy in Tokyo that a state of war had arisen between the two countries, "beginning today." It was held that Capt. Bennion's death resulted from war "or an act incident thereto."

We are not called upon to determine whether a "time of war" exists from the moment our country is attacked by the military forces of another nation, and before any declaration of war by Congress, since that question is not before us.

It is significant that in the argument of the steel seizure case, Youngstown Sheet

& Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 897, 96 L.Ed. 1153, the Government did not seek to uphold the President's action under any "war powers." In his concurring opinion, Justice Frankfurter said: "No remotely comparable practice can be vouched for executive seizure of property at a time when this country was not at war, in the only constitutional way in which it can be at war. * * * * Of twelve seizures by President Roosevelt prior to the enactment of the War Labor Disputes Act in June, 1943, three were sanctioned by existing law, and six others were effected after Congress, on December 8, 1941 [50 U. S.C.A.Appendix, note preceding section 1], had declared the existence of a state of war. In this case, reliance on the powers that flow from declared war has been commendably disclaimed by the Solicitor General." Justice Jackson said he did not find it necessary to consider the legal status of the Korean enterprise to discountenance arguments based on it. Justice Burton, in a concurring opinion, said: "The present situation is not comparable to that of an imminent invasion or threatened attack. * * * Nor is it claimed that the current seizure is in the nature of a military command addressed by the President, as Commander-in-Chief, to a mobilized nation waging, or imminently threatened with, total war." Chief Justice Vinson, in the dissenting opinion, called attention to the enormous expenditures this country has made in mobilizing and equipping an armed force of 3,500,000 men; but he did not attempt to justify the seizure on the ground of any "war" powers.

The only authorities found from a court of last resort dealing with the question of whether the Korean action is a war are decisions by the Supreme Court of Pennsylvania in the companion cases of Beley v. Pennsylvania Mut. Life Ins. Co., Pa., 95 A. 2d 202, 204, and Harding v. Pennsylvania Mut. Life Ins. Co., Pa., 95 A.2d 221, rendered since this case was submitted in this court. The exclusion clauses in both policies considered by that court excepted liability "if said death shall result by reason of * * * Military, air or naval service in time of war." Harding was in military service and was killed September 11, 1950, in a railroad accident en route to a military camp in Indiana. Beley was killed in action in Korea on March 7, 1951, while serving with the United States contingent of the United Nations forces. The court held that neither death occurred while the insured was in the military service "in time of war." In the Beley case the court said: "* * * there was not, nor ever has been, any declaration of war by Congress against any other country, state or nation, but merely a dispatch to Korea by Presidential order of military, naval and air forces of the United States in accordance with the provisions of the Charter of the United Nations and the recommendations of the Security Council. Since, therefore, it is Congress that has the power under the Constitution to declare war, and since that power is exclusive, Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 642, 72 S.Ct. 863, 96 L.Ed. 1153, it is clear that the action being waged in Korea is not a 'war' within what may be termed the 'constitutional' or 'legal' sense of that term. Defendant urges, however, that it is in fact a war, because what started apparently as a minor 'police action' has developed, by reason of its duration, its bitterness, and the number of its casualties, into a sanguinary struggle of grave proportions, and urges further that the connotation of the word 'war' in the Company's insurance policies should not be limited to a formally declared war, but embraces any clash of arms in which the methods of war are pursued, and especially where the conflict is, as in Korea, of such extensive dimensions. The trouble with this argument is that if the word 'war' in such policies were to be interpreted as other than one declared by Congress, courts would be utterly at sea whenever the question arose as to whether certain ['shootings' or] expeditions in which United States forces were engaged constituted a war. It has been pointed out in a report of the Committee on Foreign Affairs of the House of Representatives that during the period between 1798 and 1945 there were some 150 or more occasions on which our military forces were engaged in various countries, notably in China, Mexico, Central American and Caribbean Republics, in the

course of some of which incidents there were really serious engagements and many casualties. Who, then, would be the tribunal to decide whether such an undeclared conflict did or did not amount to a 'war,'— a jury, a court? What would be the criterion of decision,—the number of troops involved, the number of casualties, the duration of the hostilities? * * *.

"Obviously the right of an insured to recover under a life insurance policy should not be left to depend upon the determination of a question not governable by any definite test either legal or factual; on the contrary, its terms and conditions should be interpreted according to some definite and uniform standard. Even were it to be conceded that the meaning of any of its terms was really involved in doubt, that doubt, according to all established canons of construction, should be resolved in favor of the insured. A policy of life insurance is a highly technical instrument, drawn up presumably with meticulous care by legal experts on behalf of the Insurance Company, and who not only intend to use all terms in their legal sense but know how to accomplish that result; * * *.

"The existence or nonexistence of a state of war is a political, not a judicial, question, and it is only if and when a formal declaration of war has been made by the political department of the government that judicial cognizance may be taken thereof; when so made it becomes binding upon the judiciary. Bishop v. Jones and Petty, 28 Tex. 294, 319, 320; Perkins v. Rogers, 35 Ind. 124, 167; Hamilton v. M'Claughry, C.C., 136 F. 445, 449; Verano v. DeAngelis Coal Co., D.C., 41 F.Supp. 954." The court commented upon the fact that there was another provision of the policy excepting liability if death resulted by reason of " 'any work in connection with actual warfare,' " and said that the use of the term "actual warfare" indicated "an appreciation on the part of the insurer of the distinction between the more technical term 'war,' and the general term 'actual warfare.' "

■ It was urged in the Beley and Harding cases, as it is in our case, that if it be held that the insured was not in mili-tary service in time of war so far as the action in Korea is concerned, the United States was still at war with Germany and Japan when the deaths occurred, because no declaration or legal termination of that war had then been made. The court said: "Although the Constitution provides that Congress is the authority to *declare* war, there is no provision in regard to an authority which should have the power to declare the *termination* of war. * * * For the particular purpose here involved there was no need for a pronouncement that the war with Germany, Italy and Japan had in fact terminated some six years before Beley's death, although it may be added, as pointed out by the Superior Court in Harding v. Pennsylvania Mutual Life Insurance Company, 171 Pa.Super. 236, 241, 90 A.2d 589, that a joint resolution of Congress of July 25, 1947, 61 Stat. 449, 50 U. S.C.A.Appendix, § 584 note, did declare that, in order to terminate certain emergency and war powers, the war with those countries should be deemed ended as of that date." The Superior Court in the Harding case, supra, 90 A.2d 589, said that the President of the United States on December 31, 1946, issued a Proclamation No. 2714, 50 U.S.C.A.Appendix, § 601 note, declaring that the hostilities had terminated, and that the Congress, in Joint Resolution, on July 25, 1947, officially declared the war's end. We agree with that conclusion.

■ War means not merely the employment of force, on however large a scale, but the existence of the legal condition of things in which rights are or may be prosecuted by force. Rosenau v. Idaho Mut. Ben. Ass'n, supra.

If we are to determine from the number of casualties suffered in Korea, or the duration of the conflict, or the financial cost of the operations, that it is a time of war, when should we begin the count?

And if this nation is in a time of war because we have military forces or equipment on foreign waters or foreign soil, we have not seen much time of peace in our history; and if it will be a time of war whenever we are called upon, because of our commitments to the United Nations, to send forces or equipment to foreign

waters or foreign soil, it may be that we shall never know another time of peace. And if courts are to decide whether it is a time of war, or a time of peace, by counting the casualties or the cost, by whatever yardstick that to the courts of different states may seem appropriate, we are likely to see the anomalous situation that, by considering the fighting on another continent 8,000 miles away, in some of the states of this union it is a time of peace, and in the others it is a time of war.

War and peace are states of society, at least under our system, and power to declare when we have passed from a state of peace, with its abundant privileges, to a state of war, when the limitations on our privileges arising from that condition may be drastically applied and enforced, ought to be in some central authority of the government, operating alike on all the people in every state, so that all will have the same rights, and the same obligations to the government, at the same time.

We do not believe that this court has the power to declare that a state of war exists between the United States and North Korea, Communist China, Russia, or any other foreign power, and thereby materially affect contractual relations between our citizens, limiting their rights and privileges to those appertaining to a state of society during a time of war, by basing our declaration on some conjectural hypothesis that may be ignored, denied or repudiated in many, if not all, of the other states. We think that this ought to be and is in the exclusive power of the political department of a central government.

If appellant's contention is to be sustained, we must declare that a state of war has existed between this country and some other nation at least since the hostilities in Korea assumed some proportion—just what proportion we do not know—something this court has neither the power nor the inclination to do, and which the war-declaring and war-making department of the government for nearly three years has consistently refused to do. That under the provisions of our Constitution the many courts in the states, without a definite criterion or a uniform standard, and proceeding from different premises and hypotheses, are at liberty to render judgments in conformity with the predilections of the individual judges upon whose decisions the rights to an immense property will be made precariously to depend, is a proposition that does not command the assent of our minds. Courts cannot make the law. If they could and did, we would be cursed by a government of men and not of law, a calamity our people have had the inestimable and happy fortune thus far to escape.

We must believe that the exclusion clause was written and agreed to by the parties in contemplation of the law under which only Congress can declare war, and that it meant the legal state or condition of war. And when the law gives certain words an established meaning, this meaning is less readily controlled by the standard of interpretation otherwise applicable than is the meaning of other words. Rosenau v. Idaho Mut. Ben. Ass'n, supra.

In our view of the case, we think it is unnecessary to determine whether the exclusion clauses are susceptible of more than one interpretation, thus calling for an application of the rule that they must be construed strictly in favor of the insured, although there appears to be authority for such in regard to both clauses. Sun Life Ins. Co. of Canada v. Kiester, supra; Stinson v. New York Life Ins. Co., D.C., 69 F.Supp. 860; Beley v. Pennsylvania Mut. Life Ins. Co., supra.

After a most earnest consideration of the question, and after reviewing all the authorities found by the extensive investigation of counsel, and our own research, we have reached the conclusion that Col. Meadows' death on August 23, 1951, did not occur "in time of war," under the Constitution and laws of the United States and under the terms of the exclusion clause of his insurance policies.

Believing that the able trial court correctly resolved the questions made in the case, the judgment is affirmed.